**CHOCK FULL O'NUTS CORPORATION,**
Plaintiff,

v.

**UNITED STATES of America,**
Defendant.

No. 68 Civ. 121.

United States District Court,
S. D. New York.

Jan. 29, 1971.

Harry Geist, New York City, for plaintiff.

Whitney North Seymour, Jr., U. S. Atty., S. D. N. Y., for defendant; Michael I. Saltzman, Asst. U. S. Atty., of counsel.

OPINION, FINDINGS OF FACT and CONCLUSIONS OF LAW.

LEVET, District Judge.

This action is a claim for a refund of federal income taxes for the fiscal year

ending July 31, 1962, wherein the plaintiff, Chock Full O'Nuts Corporation, seeks to recover $18,717.70 as an alleged overpayment, together with interest of $2,023.96 paid thereon.

There is no disagreement as to the facts which have been set forth in a stipulation agreed to by the parties.[1]

The case was submitted to the court without the taking of any testimony.

After examining the stipulation, the exhibits, the pleadings and the proposed findings of fact and conclusions of law, this court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. Plaintiff, Chock Full O'Nuts Corporation, is a New York corporation with its principal place of business in New York City, New York. It is engaged in the importing and sale of coffee and other food products and in the restaurant business. (Stipulation, ¶1)

2. On or about August 1, 1961, plaintiff issued to its stockholders of record as of July 21, 1961, its $100 par value convertible subordinate debentures, bearing interest at the rate of 4½%, due August 1, 1981, in the total principal amount of $6,938,900. These debentures were issued to the stockholders at the ratio of $100 par value of debenture to 50 shares of stock. (Stipulation, ¶2)

3. The subscription price was $100 per debenture. All debentures were sold either to the stockholders or to the underwriters. Plaintiff received from this sale $6,938,900, representing $100 per debenture for 69,389 debentures. (Stipulation, ¶3)

4. The holder of each $100 debenture has the right at his option at any time up to and including August 1, 1981 to convert the debenture into fully paid and non-assessable shares of common stock of the company at the stated conversion price of $28.50 per share. (Stipulation, ¶4)

5. As of August 1, 1961, the date of sale of these debentures by plaintiff, debentures of a similar character issued by a similar company without the conversion feature would have sold at $89.625 for each $100 par value. Thus, in the case of plaintiff's debentures here in dispute, $10.375, the difference between the actual subscription price and par value of $100 per debenture, and $89.625, represents to the buyer the purchase price of the conversion feature of each debenture. (Stipulation, ¶5)

6. In its books, plaintiff did not differentiate between the portion of the $6,938,900 received from the sale of the debentures related to the $89.625 and the $10.375 per debenture. For each $100 debenture sold, plaintiff set up on its books a $100 long-term debt and a $100 cash receipt. Thus, for the entire transaction plaintiff's books reflect a $6,938,900 long-term debt and a $6,938,900 cash receipt. (Stipulation, ¶6)

7. The portion of the total sales price of $6,938,900 which is attributable to the conversion feature is $719,911. This figure is computed as the result of the multiplication of $10.375 times 69,389, the total number of debentures sold. The sum of $719,911 prorated over the 20-year life of the debentures is $35,995.58 per year. This figure is computed as the result of the division of $719,911 divided by 20. (Stipulation, ¶7)

8. Plaintiff duly filed its federal income tax return for the fiscal year ending July 31, 1962. On that return plaintiff showed a taxable income of $3,389,180 after deducting, among other things, the sum of $35,995.58 as that year's amortization of bond discount. This deduction from plaintiff's income for fiscal year ending July 31, 1962 is the yearly prorated portion of that portion of the total sales price of the debentures, computed as described above, which is attributable to the conversion features of the debentures. (Stipulation, ¶8)

1. The stipulation was filed with this court as Plaintiff's Exhibit No. 1 on October 8, 1970.

9. The Internal Revenue Service, after audit, denied plaintiff's deduction of $35,995.58 and plaintiff was assessed as a consequence the sum of $18,717.70 plus $2,023.96 in interest. This amount plaintiff paid under protest and timely filed a claim for refund and more than six months has elapsed since such filing. The plaintiff now sues to recover this amount plus statutory interest. The other adjustments to plaintiff's tax return for fiscal year ending July 31, 1962, which led to additional assessments and payments, are not here in issue. (Stipulation, ¶9)

## DISCUSSION

Plaintiff's claim then is that the value attributable to the conversion feature of the bonds in question was the equivalent of a discount of those bonds and therefore deductible under Section 1.163–3(a)(1)[2] of the Treasury Regulations.

The major obstacle to this argument is Section 1.1232–3(b)(2) of the Regulations which was promulgated in 1968 and which states:

"In the case of an obligation which is convertible into stock or another obligation, the issue price includes any amounts paid in respect to the conversion privilege."

This precludes any treatment of the conversion feature as a discount and, consequently, plaintiff seeks to challenge the validity of Section 1.1232–3(b)(2).

Plaintiff's challenges to this regulation are less than precisely drawn and overlap with each other. In substance they are as follows:

First it is argued that the definition of issue price inserted in Section 1.-1232–3(b)(2) was without statutory foundation and therefore that it is void. It is thus contended that the regulation is contrary to the Internal Revenue Code of 1954 and also that, in promulgating it, the Commissioner exceeded the power granted to him under Section 7805(a) of the Code, which is to promulgate only those regulations which are consistent with the Code.

Plaintiff sets forth two theories in support of this argument. Reliance is first placed upon Section 171(b)(1) of the 1954 Code, which states that the amount of *bond premium* on a convertible bond shall not include any amount attributable to the conversion feature of the bond. From this it is reasoned that since Congress spoke specifically as to one aspect of this area of the law, the rules of legislative interpretation dictate that if Congress had similarly intended to eliminate the discount deduction, as applied to the conversion feature, it would have done so with a specific provision in the Code.

■ This argument is unconvincing for several reasons. First of all, it conveniently ignores the well-established rule that deductions in the computation of tax are matters of legislative grace, and only if there is clear provision for a particular deduction, can one be allowed. New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440, 54 S.Ct. 788, 78 L.Ed. 1348 (1934). No section in the Code

2. Section 1.163–3 reads as follows:

"(a) Discount upon Issuance.

"(1) If bonds are issued by a corporation at a discount, the net amount of such discount is deductible and should be prorated or amortized over the life of the bonds. For purposes of this section, the amortizable bond discount equals the excess of the amount payable at maturity (or in the case of a callable bond, at the earlier call date) over the issue price of the bond (as defined in paragraph (b)(2) of § 1.1232–3)."

This regulation was promulgated on December 24, 1968 and supersedes Section 1.61–12(c)(3) which was in effect when the bonds were issued and which provided for the deduction of bond discount in substantially the same language. The history of the regulation is detailed in Montana Power Co. v. United States, 232 F.2d 541 (3rd Cir. 1956); cf. 2 Mertens, Law of Federal Income Taxation, § 12.109, n. 53 (1967 Rev.)

provides for the deduction claimed by plaintiff and it would be strange legislative interpretation indeed that would allow one to spring full-blown from the negative implications of another section of the Code.

Furthermore, the history of Section 171(b) (1) indicates a Congressional intent quite the opposite from that which plaintiff urges upon us. Prior to 1950, Section 125 of the 1939 Code, the predecessor of Section 171 of the 1954 Code, allowed a bondholder to deduct "bond premium." The Supreme Court concluded that the legislative history of Section 125 dictated the conclusion that an amount attributable to the purchase of a conversion privilege constituted deductible bond premium. In the Revenue Act of 1950, Congress "reversed" the Supreme Court by adding to the predecessor of Section 171 the sentence, "In no case shall the amount of bond premium on a convertible bond include any amount attributable to the conversion features of the bond."

Thus, plaintiff is asking us to do exactly what Congress was seeking to prevent, that is, allow the deduction of a portion of the price for a security attributable to the stock into which the bond is convertible. Here the deduction is the issuer's rather than the bondholder's, and we are dealing with bond discount rather than bond premium, but the principle is exactly the same.

A second theory advanced by the plaintiff is that the 1954 Code never differentiated between (i) a debt obligation issued as part of an investment unit consisting of an option and a bond or debenture, and (ii) a convertible debenture, and that the present regulations erroneously do just that. This argument is reasserted in other parts of plaintiff's papers in a different form, to wit, the amendment to Section 1.1232–3(b) (2) ignores substance in favor of form (and, presumably, is therefore arbitrary and capricious).

The substance of plaintiff's contention here is that in the case of an obligation issued as part of an investment unit, the issue price of the obligation includes only that part of the initial offering price paid by the buyer allocable to the debt obligation. However, with respect to a debt obligation which is convertible into stock, the Commissioner has ruled that the issue price should include any amount paid in respect to the conversion privilege.

The obvious answer is that the two types of securities are quite distinguishable. The bond and the warrant are separate property interests which may be separately sold. The convertible security offers the alternative possibilities of creditor or equity status, but the holder cannot be both. He cannot keep his bond and sell his conversion privilege.

Underlying all of plaintiff's arguments is the contention that the amendment to Section 1.1232–3(b) (2) is new and unprecedented. While plaintiff never articulates a specific argument to the effect that the regulation cannot be retroactively applied to the transaction in question, that seems to be the substance of plaintiff's claim and the court feels compelled to address itself to that issue.

■ In theory, a regulation which interprets a statute is neither prospective or retroactive. It merely clarifies what the language of the statute was intended to convey. See 1 Mertens, Law of Federal Income Taxation, § 3.25. As a practical matter, of course, regulations are often retroactive in their operation. However, there is nothing unusual or improper in such a retroactive application of a Treasury regulation. Helvering v. Reynolds, 313 U.S. 428, 433, 61 S.Ct. 971, 85 L.Ed. 1438 (1940). As the Supreme Court said in Reynolds (at page 433, 61 S.Ct. at page 974):

"To hold that [the taxpayer] had a vested interest in a hypothetical decision in his favor prior to the advent of the regulations would introduce into the scheme of the Revenue Acts refined notions of statutory construction which would, to say the least, im-

pair an important administrative responsibility in the tax collecting process."

Nevertheless, this quoted extract must be read in conjunction with an earlier case (Helvering v. R. J. Reynolds, 59 S. Ct. 423, 83 L.Ed. 536 (1939)) which held that regulations which have been followed by a re-enactment of the statute are to be given the "force and effect of law."

■ It is clear from these two cases that retroactive regulations will be upheld if enacted within a reasonable time under the existing statute and if there are no prior regulations to the contrary. It is not entirely clear from these cases whether a taxpayer is entitled to an argument of equitable estoppel where he has relied upon a prior inconsistent regulation which has not been followed by the re-enactment of the statute. See 1 Mertens, Law of Federal Income Taxation, § 3.25.

■ We need not resolve this question, however, since petitioner has no basis for any claim that he has been misled. As previously stated, there was no statutory provision nor any regulation which specifically granted to petitioner the deduction he claims. To the extent that petitioner relies on Section 1.163–3(a), which allows deduction for bond discount, petitioner ignores the well-settled definition of bond discount as the difference between the amount borrowed and the principal amount to be paid. Pierce Oil Corporation, 32 B.T.A. 403, 420 (1935).

Here, if plaintiff discharges the bond at maturity, he will have incurred no additional cost since the amount he pays will not exceed the amount he received, including any amount attributable to the conversion privilege. If, on the other hand, the holder chooses to convert his indebtedness into stock, there can be no discount since plaintiff will never retire the debenture.

■ Finally, plaintiff's last two points can be dealt with quite briefly. First, it is contended that the Commissioner's treatment of convertible bonds with regard to claims for discount deduction is not consistent with his treatment of deductions for bond premium as indicated by the example illustrating § 1.61–12(c) (5) [3] of the Regulations. The short answer to this claim is that the Commissioner's treatment of the conversion feature in these two different contexts is actually quite consistent. In neither the discount nor the premium situation is amortization of the conversion feature being allowed. If this happens to work to plaintiff's benefit in one situation, but not the other, that hardly means that the Commissioner is being inconsistent. Moreover, in the cited example, there is an actual payment of premium, whereas we find here that plaintiff's claimed discount is merely hypothetical.

Lastly, plaintiff points to the fact that a revenue agent in the audit of another taxpayer's return temporarily allowed and subsequently disallowed a discount deduction in a transaction similar

3. REGULATIONS: 1.61–12. Income from discharge of indebtedness.

\* \* \* \* \*

"(c) Issuance and repurchase of corporate bonds.

\* \* \* \* \*

"(5) The provisions of this paragraph are illustrated by the following examples:

"Example. (i) M Corporation, on January 1, 1946, the beginning of its taxable year, issued for $115,000, 3 per cent bonds, maturing 10 years from the date of issue, with a stated redemption price at maturity of $100,000. The bonds were convertible into common stock at the option of the holder. The value of the conversion feature of the bonds, as determined under paragraph (c) of § 1.171–2, is $11,500. The net amount, or amortizable portion, of bond premium which is included in income over the 10-year life of the bonds is $3,500, computed as follows:

"Issue price ...............$115,000
"Less: Redemption price .... 100,000

"Premium ................$15,000
"Value of conversion feature ..$11,500

"Amortizable amount ........$ 3,500"

\* \* \* \* \*

to the one involved here. Plaintiff conceded that this is not binding upon the government. We agree with plaintiff that it is not binding. We find further that it is not relevant.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the parties and the issues pursuant to 28 U.S.C. § 1346(a).

2. Section 1.1232–3(b) (2) of the Treasury Regulations applies to the transaction in issue, and is valid.

3. As is provided in the foregoing Treasury Regulations, the issue price of plaintiff's convertible debentures included any amount attributable to the conversion feature, and, therefore, plaintiff will pay no more on retirement of the bonds than it received on their issuance and realizes no deductible discount on their issuance.

4. The amount of $20,741.66 paid to defendant was properly assessed and collected.

Judgment for defendant, United States of America, with costs.

Settle judgment upon notice.