**CHOCK FULL O' NUTS CORPORATION,**
Plaintiff-Appellant,

v.

**UNITED STATES of America,**
Defendant-Appellee.

No. 156, Docket 71–1536.

United States Court of Appeals,
Second Circuit.

Argued Oct. 20, 1971.

Decided Dec. 21, 1971.

Harry Geist, New York City, for plaintiff-appellant.

Michael I. Saltzman, Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty., Michael D. Hess and Alan B. Morrison, Asst. U. S. Attys., New York City, on the brief), for defendant-appellee.

Stuart S. Opotowsky, Alan D. Berlin, New York City, for amicus curiae Hunt Foods & Industries, Inc.; Walter J. Rockler, Julius M. Greisman, Richard L. Hubbard, Washington, D. C., for amicus curiae J. P. Stevens & Co., Inc., Alex M. Gruder, Stamford, Conn., for amicus curiae Olin Corp.; Arnold & Porter, Washington, D. C., of counsel, on the brief for amici curiae.

Before MEDINA, MANSFIELD and MULLIGAN, Circuit Judges.

MANSFIELD, Circuit Judge:

This appeal raises the question, apparently one of first impression, whether a corporation which has issued callable convertible bonds at par is entitled under the Internal Revenue Code of 1954 and the Treasury Regulations promulgated thereunder by the Commissioner of Internal Revenue to deduct as "original issue discount" that part of the issue price allocable to the conversion feature.

The factual background is undisputed. Appellant Chock Full O' Nuts Corporation ("the taxpayer"), a New York corporation engaged in the importing and sale of coffee and other food products and in the restaurant business, issued on or about August 1, 1961, its $100 par value convertible subordinated debentures, at 4½% interest, due in 20 years, in the total principal amount of $6,938,900. The holder of each $100 debenture had the option of converting it into shares of the taxpayer's common stock at a stated conversion price per share ($28.50) unless the debenture should be called for redemption by the taxpayer before the holder exercised his option.[1] The parties have stipulated that as of the date of the sale of the debentures, the same debentures *without the conversion feature* would have sold at $89.625 for each $100 par value. In its corporate income tax return for the fiscal year ending July 31, 1962, the taxpayer claimed a deduction of $35,995.58 as that year's amortization of the bond discount, a figure arrived at by multiplying the number of debentures sold, 69,389, by $10.375, the claimed discount, and by dividing the result ($719,911) by the 20-year life of the bonds.

The Commissioner denied the deduction and assessed the sum of $18,717.70 plus $2,023.96 in interest. Taxpayer paid this amount under protest and began suit in the district court for a refund. In an opinion reprinted at 322 F.Supp. 772 (S.D.N.Y.1971), Judge Levet, to whom the case was submitted by the parties for decision upon stipulated facts without taking of testimony, awarded judgment to the United States. We affirm.[2]

No provision of the Internal Revenue Code explicitly allows issuers of bonds to deduct original issue discount. However, every federal income tax act since 1864 has included a provision for the deduction of interest paid.[3] Section 163 of the Internal Revenue Code of 1954, for instance, which was in effect at all relevant times, permits deduction of "interest paid or accrued within the taxable years on indebtedness." It has long been accepted that "original issue discount serves the same function as stated interest." United States v. Midland-Ross Corp., 381 U.S. 54, 57, 85 S.Ct. 1308, 1310, 14 L.Ed.2d 214 (1965). Like

---

1. Stipulation of August 15, 1969, ¶ 4.

2. Appearing as *amici curiae* urging reversal were Hunt Foods & Industries, Inc., J. P. Stevens & Co., Inc., and Olin Corporation, each of which issued convertible debentures and claimed an original issue discount deduction.

3. See, *e. g.*, Rev.Act of 1864, § 117, 13 Stat. 282; Rev.Act of 1913, § II(G) (b) (third), 38 Stat. 173.

interest, discount represents a cost of borrowing money. Both are also alternative means of determining the price which a bond will command in the market.[4] Ever since Article 150 of Treas. Reg. 33 was promulgated under the Internal Revenue Code of 1916 the Commissioner has recognized that this economic congruence required equal tax treatment. The current regulation is § 1.163–3(a) (1), which provides in pertinent part:

> "Deduction for bond discount.—(a) *Discount upon issuance.* (1) If bonds are issued by a corporation at a discount, the net amount of such discount is deductible and should be prorated or amortized over the life of the bonds."

At the time of the taxpayer's issuance of its convertible bonds in 1961, the applicable regulation was § 1.61–12(c) (3), whose language is identical to that of § 1.163–3(a) (1).[5]

To determine whether that part of the issue price paid by the holder for the conversion privilege of a convertible bond constitutes original issue discount, as appellant here contends, we look to the Code and regulations defining that term. At the time of the issuance of the taxpayer's bonds in 1961, § 1232(b) (1) defined "original issue discount" to be "the difference between the issue price and the stated redemption price at maturity." "Issue price" was defined by § 1232(b) (2) to be "the initial offering price to the public at which price a substantial amount of such bonds or other evidences of indebtedness were sold."

The Government has argued that our problem is greatly simplified by the Commissioner's promulgation in 1968 of Treas.Reg. § 1.1232–3(b) (2) (i), which was made retroactive to obligations issued after December 31, 1954. It defines "issue price" in the case of an obligation convertible into stock or into another obligation to include "any amount paid in respect of the conversion privilege." Since original issue discount is defined as the difference between the issue price and the stated redemption price at maturity, taxpayer's debentures would not have been issued at a discount if Treas.Reg. § 1.1232–3(b) (2) (i) were to be applied. In reply, the taxpayer contends that that Regulation should not be given retroactive effect, arguing that it represented an effort to change the policy of existing regulations in order to support the Government's position in its pending litigation with the taxpayer.

We recognize that subject to certain limitations the Commissioner is empowered to prescribe the extent, if any, to which his regulations shall be given retroactive effect. Int.Rev.Code § 7805(b). See Helvering v. Griffiths, 318 U.S. 371, 397–399 n. 49, 63 S.Ct. 636, 87 L.Ed. 843 (1943). Indeed, it is the Commissioner's position that every Revenue Ruling is to be accorded retroactive treatment unless some specific statement of nonretroactivity is included. Rev.Proc. 68–37, 1968–2 Cum.Bull. p. 926. The Commissioner's authority in this area, however, is subject to review for abuse of discretion. "The Internal Revenue Service does not have *carte blanche.* Its choice must be a rational one, supported by relevant considerations." International Business Machines Corp. v. United States, 343 F.2d 914, 920, 170 Ct.Cl. 357, 367 (1965), cert. denied, 382 U.S. 1028, 86 S.Ct. 647, 15 L. Ed.2d 540 (1966).[6] While retroactivity

---

4. Of course, there are often additional determinants, *e. g.,* maturity date, prevailing market rates of interest, the issuer's credit standing, degree of subordination, and other particular terms of the debenture.

5. The history of this regulation is traced in Montana Power Co. v. United States,

232 F.2d 541, 546–548 (3d Cir.), cert. denied, 352 U.S. 843, 77 S.Ct. 51, 1 L.Ed. 2d 59 (1956).

6. Thus, courts have declined to give retroactive effect to regulations or rulings of the Commissioner when retroactivity would work a change in settled law relied on by the taxpayer and implicitly ap-

in tax regulations is therefore presumptively permissible, it is in each case for the court to determine whether under all the circumstances retroactive application would be warranted.[7] See May Seed & Nursery Co. v. Commissioner, 242 F.2d 151, 155 (8th Cir.), cert. denied, 355 U. S. 839, 78 S.Ct. 62, 2 L.Ed.2d 51 (1957); Kay v. Commissioner, 178 F.2d 772, 773 (3d Cir. 1950).

■■ To the extent that a regulation interprets or elucidates the meaning of a statute, it is merely explanatory or confirmatory rather than retroactive.[8] A taxpayer, when acting in an area of unsettled law, has no "vested interest in a hypothetical decision in his favor prior to the advent of the regulations." Helvering v. Reynolds, 313 U.S. 428, 433, 61 S.Ct. 971, 974, 85 L.Ed. 1438 (1941).[9] On the other hand, the Commissioner may not take advantage of his power to promulgate retroactive regulations during the course of a litigation for the purpose of providing himself with a defense based on the presumption of validity accorded to such regulations. Here, for instance, while the taxpayer issued its bonds in August, 1961, took its discount deduction in 1962, filed its claim for a refund in January, 1966, and began suit in January, 1968, Treas.Reg. § 1.1232–3(b) (2) (i) was not promulgated until December, 1968. 33 Fed.Reg. 19176.

■ Thus it is questionable whether Treas.Reg. § 1.1232–3(b) (2) represents a valid exercise of the Commissioner's power to promulgate retroactive regulations. We find it unnecessary to resolve that issue, however, for the reason that, even under the regulations that had been promulgated at the time of issuance of the debentures, the portion of the original issue price allocable to the conversion feature did not constitute "original issue discount," which turns on the definition of "issue price" in Internal Revenue Code § 1232(b) (2) as "the initial offering price to the public." To accept the taxpayer's contention would be to depart from that definition. Here the initial offering price of the bonds to the public was $100 per bond. The taxpayer asks that a component of that offering price—the part attributable to the con-

proved by Congress, Helvering v. R. J. Reynolds Tobacco Co., 306 U.S. 110, 116, 59 S.Ct. 423, 83 L.Ed. 536 (1939), when it would lead to inequality of treatment between taxpayers, International Business Machines Corp. v. United States, *supra*, when litigation involving the area clarified by the regulation had already been begun, Commissioner of Internal Revenue v. Goodwyn Crockery Co., 315 F.2d 110, 113 (6th Cir. 1963), or when, in general, the result of retroactivity in a particular case would be unduly harsh, Lesavoy Foundation v. Commissioner, 238 F.2d 589, 594 (3d Cir. 1956); cf. Woodward v. United States, 322 F.Supp. 332, 335 (W.D.Va.1971).

7. Even tax *statutes* which have been given retroactive effect by Congress, although not necessarily unconstitutional because of their retroactivity, Welch v. Henry, 305 U.S. 134, 59 S.Ct. 121, 83 L.Ed. 87 (1938), may be denied such effect where "harsh, arbitrary, or unfair." See e. g., Shanahan v. United States, 447 F.2d 1082, 1084 (10th Cir. 1971).

8. See K. C. Davis, Administrative Law Treatise § 5.09, p. 347 (1958):

"If an interpretive rule is merely an interpretation of a statute, and if the meaning of the statute has been there from the time of its original enactment, then no problem of a retroactive interpretive rule can arise, for either the interpretive rule expresses the true meaning of the statute or it does not; if it does, then that is what the statute has always meant and the rule has not changed the law retroactively; if it does not, then it does not matter whether the rule can be made retroactive, for the rule is invalid in that it is inconsistent with the statute."
In the tax area at least, such a view has been labelled a "fiction" by Professor (now Solicitor General) Griswold. See Griswold, A Summary of the Regulations Problem, 54 Harv.L.Rev. 398, 415 (1941).

9. We note in passing that the Commissioner approved the amortization and deduction of bond "discount" by *amicus* J. P. Stevens & Co., Inc. for the years 1965 to 1968, not changing its position until after the adoption of Treas.Reg. § 1.1232–3(b) (2) in December, 1968.

version feature—be excluded and that the balance be treated as the offering price for the purpose of finding whether there was an "original issue discount" within the meaning of § 1232(b) (1). However, we find no evidence that the term "offering price" was intended to apply solely to the investment element of a convertible bond as distinguished from its conversion element. Moreover, if we were to exclude the value of the conversion feature in determining the issue price, we could by the same logic deduct that figure when arriving at the redemption price, in recognition of the fact that the bond contains two distinct and separate components. We do not believe that the statutory language contemplates such a division.[10]

Furthermore, if we look to the substance of the transaction and overlook the failure of taxpayer's debentures to satisfy the express requirements of Treas.Reg. § 1.1232–3(b) (1) for computation of an original issue discount, the taxpayer has failed to satisfy its burden of showing that the amount of the issue price allocable to the conversion feature represents a cost of borrowing money that must without qualification be paid. Its inability to meet this condition arises from the fact that the debentures provide for two mutually exclusive modes of satisfaction. Under one the holder may exercise his right to convert the debenture into common stock, in which event he will surrender his debenture and it will not be redeemed or paid at maturity. To permit deduction of the amount attributable to the conversion feature in the face of such a possibility would be to disregard established conditions precedent to the allowance of discount as a cost of borrowing money which must be repaid. "Amortized bond discount," wrote Mr. Justice (later Chief Justice) Stone for the Supreme Court in 1934, "is deductible from the taxpayer's gross income *only* by way of anticipation of payment of the bonds at maturity." Old Mission Portland Cement Co. v. Helvering, 293 U.S. 289, 292, 55 S.Ct. 158, 160, 79 L.Ed. 367 (1934) (emphasis added). The alternative to conversion is that the taxpayer will redeem the debenture or pay it at maturity, in which event the conversion privilege will be terminated and it will pay out no more than it received at the time of issuance, thus precluding the existence of any original issue discount.

In no event will the taxpayer be required both to honor the conversion privilege *and* to redeem the debenture. By the terms of the debenture, no conversion may take place until the bond is surrendered, and the option to convert expires as the bond becomes due. "The holder of an obligation convertible into stock has the privilege of electing between two alternative modes of satisfaction, but he cannot resort to both."[11] Therefore we feel that the taxpayer is not entitled to a deduction for original issue discount based upon two inconsistent assumptions, first that the debentures will be redeemed and second that they will be converted into common stock.

A further contention of the taxpayer which merits consideration is its attempt to analogize convertible bonds to bond-warrant investment units, which consist of (1) a bond obligation *and* (2) an option or warrant for the purchase of stock. The statutory definition of "issue price" contained in § 1232(b) (2) and Treas.Reg. § 1.163–3(a) (2) makes clear that in the case of a bond issued as part of an investment unit the total price received for the investment unit is to be allocated between the bond and the warrant according to their fair market

10. See Fleischer & Cary, The Taxation of Convertible Bonds and Stock, 74 Harv.L. Rev. 473, 516 (1961) ; Note, The Tax Consequences of Redemption of Convertible Bonds, 49 B.U.L.Rev. 96, 102–03 (1969).

11. Hills, Convertible Securities—Legal Aspects and Draftsmanship, 19 Calif.L. Rev. 1, 13 (1930) ; Fleischer & Cary, *supra*, at 515.

values, with the market value of the bond being accepted as its issue price. Taxpayer urges that consistency requires the same treatment of a convertible debenture. While this argument has a surface appeal, it ignores the essential economic differences between a bond-warrant investment unit and a convertible debenture.

The convertible debenture is an indivisible unit; the issuer has but one obligation to meet, either redemption *or* conversion. It can never be required to do both. With the bond-warrant investment unit, however, the holder receives and the issuer incurs two separate and independent obligations, and both may have to be fulfilled. Indeed, while the warrant and debt obligations are often issued as a package, since they are far more attractive to investors in unison than they would be separately, they are totally independent and separable obligations, and the warrant, unlike the conversion privilege, should be independently valued.[12] Further evidence of this independence is the fact that the conversion feature of a bond is not assignable apart from the bond itself, 6A W. Fletcher, Private Corporations § 2693, p. 87 (1968 perm.ed.), whereas warrants "are customarily traded both on the [stock] exchanges and in the over-the-counter market." I L. Loss, Securities Regulation ch. 3A, p. 467 (2d ed. 1961). Finally, the accounting profession has recently underscored these distinctions between conversion features and warrants by adopting rules which recommend differing treatment on the issuer's financial statements.[13]

The taxpayer next urges that to deny it the right to deduct the value of the conversion privilege in determining the presence of discount is a "flat contradiction" of Treas.Regs. §§ 1.61–12(c) (5) and 1.171–2(c) (1), which require the subtraction of the value of any conversion feature from the issue price of the bond in determining whether the bond was issued at a premium. We disagree. It is true that the issuer of a bond at premium is not required to include in income that portion of the premium which represents the conversion privilege, nor is the holder entitled to deduct that amount as interest. But, as the district court properly noted, 322 F. Supp. at 776, in neither the premium nor the discount cases is the amount attributable to the conversion feature allowed to be amortized. Thus, there is no substantive inconsistency in the treatment accorded by the Regulations to the value of the conversion feature. The issuer may not gain a tax deduction on the basis of the conversion privilege in either the discount or the premium situation, nor may the holder deduct it as interest.[14]

The Government's position is buttressed by the further fact that amounts paid for conversion privileges are usually attributable to equity transactions rather than to the cost of borrowing money.[15] The Accounting Principles Board, for instance, has noted that the issuer, "in planning its long-range financing, may view convertible debt as essentially a means of raising equity capital,"[16] and that when investors assess the attractiveness of a convertible bond offering, "the conversion feature may be of primary importance, with the debt feature regarded more as a hedge than as the principal investment

12. Symposium, Convertible Debentures and Strange Securities, 28 N.Y.U.Inst. of Fed. Tax. 331, 347 (1970).

13. Accounting Principles Board Opinion No. 14 (March, 1969). The APB is of the opinion that "no portion of the proceeds from the issuance of . . . convertible debt securities . . . should be accounted for as attributable to the conversion feature," (¶ 12), but that

"the proceeds from the sale of debt with stock purchase warrants should be allocated to the two elements for accounting purposes." (¶ 15).

14. *Cf.* De Kosmian, Original Issue Discount, 22 Tax Lawyer 339, 360 (1968).

15. Note, 49 B.U.L.Rev. 96, 112 (1969).

16. Accounting Principles Board Opinion No. 14, ¶ 4.

objective."[17] Indeed, a 1955 survey reported that a large majority of corporations issuing convertible bonds did so to raise additional equity capital rather than to improve the salability of their debentures.[18] Thus, denial of a deduction under these circumstances would be in line with the policy of the Internal Revenue Code disallowing deductions for amounts paid in capital transactions. See, *e. g.*, Int.Rev.Code § 249.[19]

Having in mind that the interest deduction, like all other deductions, is to be narrowly construed, New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440, 54 S.Ct. 788, 78 L.Ed. 1348 (1934), we fail to see how, in view of the possibility of conversion, the $10.375 which the taxpayer seeks to deduct over the life of each debenture is the economic equivalent, under these circumstances, of a fixed interest charge that must without qualification be paid each year. Gilbert v. Commissioner, 248 F.2d 399, 402 (2d Cir. 1957) (Medina, J.). Possibly the taxpayer has incurred some costs in connection with the conversion feature, such as having to keep authorized but unissued stock on hand, having to convert at the holders' request, having to risk possible harm to the corporation's borrowing position, possibly having to offer more than the stated call price in order to prevent a conversion, or having to disclose possible dilution of shareholders' equity on the balance sheet. Whatever costs the taxpayer here may have incurred in the granting of this conversion feature, however, they are highly speculative [20] and they differ from the type of economic costs which § 163 was designed to mitigate.

For the foregoing reasons we are convinced that the taxpayer is not entitled to the interest deduction which it claimed on its fiscal year 1962 return. The judgment of the district court is affirmed.

---

17. *Id.* at ¶ 8.

18. Note, 49 B.U.L.Rev. 96, 112 and n. 57 (1969).

19. Section 249, added in 1969, provides that, in the repurchase by the issuer of its convertible obligation, premium attributable to the conversion privilege rather than the cost of borrowing is nondeductible. 26 U.S.C. § 249. Congress reasoned that such excess is "not analogous to an interest expense or deductible business expense, but rather is similar to an amount paid in a capital transaction. In effect, the corporation is repurchasing the right to convert the bonds into its common stock, much as it might purchase its stock." H.R.Rep.No.91–413, 91st Cong., 1st Sess. 111 (1969), 1969 U.S. Code Cong. & Admin.News pp. 1645, 1759–1760. Section 249 was made necessary by the decision in Roberts & Porter, Inc. v. Commissioner, 307 F.2d 745 (7th Cir. 1962), which allowed the entire premium to be deducted, and the Commissioner's nonacquiescence in that decision, Rev.Rul. 67–409, 1967–2 Cum.Bull. p. 62.

20. For an argument that the corporate issuer often incurs no expense in granting a conversion feature, see A. Dewing, I The Financial Policy of Corporations 269–70 n. cc (1953). Professor Dewing also challenges the idea that the corporation's existing stockholders are hurt because of a dilution of equity.