SEABOARD COFFEE SERVICE, INC., PETITIONER ·V. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 9355–76. Filed December 28, 1978.

*Frank P. Meadows, Jr.,* and *T. Stewart Gibson,* for the petitioner.

*Frank D. Armstrong, Jr.,* for the respondent.

SIMPSON, *Judge:* The Commissioner determined deficiencies in the petitioner's Federal corporate income taxes, and the petitioner claimed an overpayment, as follows:

| TYE May 31— | Deficiency | Overpayment |
|---|---|---|
| 1973 | $10,987.87 | $714.64 |
| 1974 | 14,975.54 | --- |
| 1975 | 14,975.53 | --- |

Certain issues have been settled. The issues remaining for decision are: (1) Whether original issue discount arises where a corporation issues debentures after May 27, 1969, for its own stock when neither the stock nor the debentures are traded on an established securities market; and (2) whether the petitioner is entitled to amortize and deduct as interest under section 163(a), I.R.C. 1954,[1] a call premium which would be due if the petitioner exercised its option to redeem certain debentures prior to maturity.

---

[1] All statutory references are to the Internal Code of 1954, as in effect during the years in issue.

## FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioner, Seaboard Coffee Service, Inc. (Seaboard), is a corporation whose principal place of business was in Rocky Mount, N. C., at the time it filed its petition in this case. It filed its Federal corporate tax returns on the basis of a taxable year ending May 31, and we shall identify each taxable year by the calendar year in which it ended. For its taxable years 1973, 1974, and 1975, the petitioner filed its Federal corporate income tax returns with the Internal Revenue Service Center, Memphis, Tenn. During the years at issue, the petitioner kept its books and records and reported its income using an accrual method of accounting.

Prior to June 1, 1962, William W. Holmes and John E. Dubel operated as partners a wholesale institutional food business catering to the hotel and restaurant trade in the eastern part of North Carolina. On June 1, 1962, Mr. Holmes and Mr. Dubel incorporated such business as Seaboard. They transferred $300 in cash and their partnership interests, which had a combined tax basis of $62,000, to Seaboard in exchange for 31,150 shares of Seaboard's common stock to each of them. Between June 1, 1962, and August 1, 1971, the petitioner issued an additional 124,600 shares of its common stock upon the capitalization of retained earnings through stock dividends. Such shares were divided evenly between Mr. Dubel and Mr. Holmes so that on July 31, 1971, each of them owned a total of 93,450 shares of Seaboard's common stock.

In November 1969, Mr. Dubel informed Mr. Holmes that he would no longer actively participate in Seaboard's business because of his health. Subsequently, during 1970, a management dispute arose between Mr. Dubel and Mr. Holmes. After extended negotiations, they agreed to resolve their differences by having the petitioner redeem its outstanding stock owned by Mr. Dubel.

On July 31, 1971, the petitioner entered into an agreement with Peoples Bank & Trust Co. as trustee, whereby the petitioner issued in principal $575,000 of 7.08-percent subordinated convertible debentures due August 1, 1986, in exchange for 93,450 shares of the petitioner's common stock held by Mr. Dubel. Under the indenture agreement, the petitioner, at its

option, could redeem the debentures upon proper notice at any time after August 15, 1981, at the following percentages of principal:

| Period | Percentage of principal |
|---|---|
| 8/15/81 to 7/31/82 ........................ | 120 percent |
| 8/1/82 to 7/31/83 ........................ | 115 percent |
| 8/1/83 to 7/31/84 ........................ | 110 percent |
| 8/1/84 to 7/31/85 ........................ | 105 percent |
| 8/1/85 to maturity ........................ | 100 percent |

However, if the petitioner exercises such option and gives notice thereof, then Mr. Dubel would have a minimum of 23 days after the date he receives such notice in which to convert the debentures into common stock.

The common stock of Seaboard is not, and has never been, traded on an established securities market, and the debentures issued in exchange for Mr. Dubel's stock were not part of an issue that had been traded on an established securities market. The parties stipulated that the redemption of Mr. Dubel's stock qualified as an exchange under section 302(a).

On its Federal income tax return for each of the years in issue, the petitioner claimed a deduction of $19,320 based on its conclusion that the debentures had been issued at a discount of $193,200 and that such discount represented interest to be amortized over a 10-year period commencing on August 1, 1971, and ending July 31, 1981. In addition, the petitioner claimed a deduction of $11,500 for the bond redemption premium. Such deduction was one-tenth of the 20-percent call premium—or $115,000—which would be due if the petitioner redeemed the debentures between August 15, 1981, and July 31, 1982.

In his notice of deficiency, the Commissioner disallowed the interest deduction for original issue discount because he determined the bonds were not issued at a discount, and he disallowed the interest deduction for the redemption premium because such premium was contingent upon the occurrence of future events. After the trial, the petitioner amended its petition to claim a discount of $228,500 and to concede such amount should have been amortized over a 15-year rather than a 10-year period.

## OPINION

The first issue for decision is whether Seaboard issued its debentures to Mr. Dubel at a discount which was amortizable over the life of the debentures and deductible as interest under section 163. The Commissioner argues that there is no deductible interest in this case as a result of the exchange of Seaboard's stock for its debentures because the debentures were not issued at a discount. In support of his position, he relies on section 1.163–4(a)(1), Income Tax Regs., which in relevant part provides:

Sec. 1.163–4 Deduction for original issue discount on certain obligations issued after May 27, 1969.

(a) *In general.* (1) If an obligation is issued by a corporation with original issue discount, the amount of such discount is deductible as interest and shall be prorated or amortized over the life of the obligation. For purposes of this section * * * the term "original issue discount" shall have the same meaning as in section 1232(b)(1) * * * For the rule as to whether there is original issue discount in the case of an obligation issued in an exchange for property other than money, and the amount thereof, see paragraph (b)(2)(iii) of sec. 1.1232–3. * * *

Section 1232(b)(1) defines "original issue discount" as "the difference between the issue price and the stated redemption price at maturity." Section 1232(b)(2) defines "issue price" and in relevant part provides:

In the case of a bond or other evidence of indebtedness * * * as described in this paragraph (other than a bond or other evidence of indebtedness * * * issued pursuant to a plan of reorganization within the meaning of section 368(a)(1) or an insolvency reorganization within the meaning of section 371, 373, or 374), which is issued for property and which—

(A) is part of an issue a portion of which is traded on an established securities market, or

(B) is issued for stock or securities which are traded on an established securities market,

the issue price of such bond or other evidence of indebtedness * * * shall be the fair market value of such property. Except in cases to which the preceding sentence applies, the issue price of a bond or other evidence of indebtedness * * * which is issued for property (other than money) shall be the stated redemption price at maturity.

Based on such statutory provisions, section 1.1232–3(b)(2)(iii)(*a*), Income Tax Regs., provides in relevant part:

(iii) *Issuance for property after May 27, 1969—(a) In general.* Except as provided in (*b*) of this subdivision, if an obligation * * * is issued for property other than money, the issue price of such obligation shall be the stated

redemption price at maturity and, therefore, no original issue discount is created as a result of the exchange. * * *

Under section 1.1232–3(b)(2)(iii)(*b*), if either the debt obligation being issued or the stock received by the corporation in the exchange is traded on an established securities market and the exchange is not pursuant to a plan of reorganization, then the issue price of the obligation shall be its fair market value. See also sec. 1.1232–3(b)(2)(iii)(*c*).

On the other hand, the petitioner disputes the validity of section 1.163–4(a)(1) insofar as it relies upon the definition of "issue price" contained in section 1232 and denies a deduction for original issue discount when the debt obligation is issued for property other than money and when neither the indebtedness nor the stock is traded on an established securities exchange. It argues that the Supreme Court in *Commissioner v. Nat. Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134 (1974), upheld the principle of allowing a deduction for original issue discount when the corporation issues debentures for its own stock, that the amendment of section 1232 only applies to the holder of the indebtedness, not the issuer, and that the Commissioner's attempt to apply the definition of issue price in section 1232 to the issuer of such indebtedness is "an unwarranted and illegal attempt to amend sec. 163 by regulation when Congress omitted such amendment from the statute." Thus, we are called upon to pass on the validity of section 1.163–4(a)(1).

Section 7805(a) expressly authorizes the Secretary to prescribe "all needful rules and regulations for the enforcement of this title, including all rules and regulations as may be necessary by reason of any alteration of law in relation to internal revenue." It has been held repeatedly that the courts are to sustain the regulations unless they are arbitrary. *Fulman v. United States*, 434 U.S. 528, 533 (1978); *Bingler v. Johnson*, 394 U.S. 741, 749–750 (1969); *Commissioner v. South Texas Lumber Co.*, 333 U.S. 496, 501 (1948). Based on the legislative history concerning the 1969 amendment of section 1232, and the fact that the courts have looked to section 1232(b)(2) for the definition of issue price and have applied such definition to both the issuer and holder, we are satisfied that the Commissioner had adequate reason for the adoption of section 1.163–4(a)(1) and that such regulation is valid.

Original issue discount typically arises when a debt obligation

is sold at a price which is below the face amount of the obligation. *Commissioner v. Nat. Alfalfa Dehydrating & Milling Co., supra* at 143; *Fed-Mart Corp. v. United States,* 572 F.2d 235, 237 (9th Cir. 1978); *Cities Service Co. v. United States,* 522 F.2d 1281 (2d Cir. 1974), cert. denied 423 U.S. 827 (1975). Though no provision of either the Internal Revenue Code or the various revenue acts expressly authorizes the issuer to deduct any amount because of original issue discount, successive regulations "beginning with Art. 150 of Treasury Regulations 33 (revised 1918), issued under the Revenue Act of 1916, have provided for such amortization and deduction by the issuer." *Commissioner v. Nat. Alfalfa Dehydrating & Milling Co., supra* at 143. Where a debt obligation is issued for money, it has long been settled that the issuer is entitled to amortize the discount over the life of the debt obligation and deduct it as interest under section 163(a). *Commissioner v. Nat. Alfalfa Dehydrating & Milling Co., supra* at 145; *Dixon v. United States,* 381 U.S. 68 (1965); *United States v. Midland-Ross Corp.,* 381 U.S. 54, 57 (1965).

Yet, where debt obligations were issued in exchange for property (other than money) prior to May 28, 1969, the tax treatment of the issuer was unclear. Several courts had considered the issue and reached different conclusions. Compare *Nassau Lens Co. v. Commissioner,* 308 F.2d 39 (2d Cir. 1962), remanding 35 T.C. 268 (1960); *American Smelting & Refining Co. v. United States,* 130 F.2d 883 (3d Cir. 1942); *Southern Fertilizer & Chemical Co. v. Edwards,* 167 F. Supp. 879 (M.D.Ga. 1955), with *Southern Natural Gas Co. v. United States,* 412 F.2d 1222 (Ct. Cl. 1969); *Montana Power Co. v. United States,* 159 F. Supp. 593 (Ct. Cl. 1958), cert. denied 358 U.S. 842 (1958); *Montana Power Co. v. United States,* 232 F.2d 541 (3d Cir. 1956), cert. denied 352 U.S. 843 (1956). In *Commissioner v. Nat. Alfalfa Dehydrating & Milling Co., supra,* the Supreme Court had before it debt obligations issued before 1969. The Court did not allow a deduction for discount in that case because it found that the issuer had failed to prove that the obligations were in fact issued at a discount. However, its opinion has been construed to recognize that a deduction for discount may be allowable when debt is issued for stock if the fact of discount is proved. *Gulf, Mobile & Ohio Railroad Co. v. United States,* 579 F.2d 892 (5th Cir. 1978); *Cities Service Co. v. United States,* 522 F.2d at 1287– 1289; W. Rockler, J. Greisman, & R. Hubbard, "Status of

amortizable bond discount after *National Alfalfa* case," 41 J. Taxation 134 (1974); but see *Fed-Mart Corp. v. United States*, 572 F.2d at 237. Notwithstanding the deduction sometimes allowed the issuer, it has long been established that the holder of a debt obligation issued at a discount prior to May 28, 1969, need not report any income as a result of such discount until there is a taxable sale or exchange of the obligation. H. Rept. 91–413 (1969), 1969–3 C.B. 200, 268–269, 388–390; S. Rept. 91–552 (1969), 1969–3 C.B. 423, 516–518; Conf. Rept. 91–782 (1969), 1969–3 C.B. 644, 662;[2] H. Rept. 1337, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess. 83–84, A275–A277 (1954); S. Rept. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess. 112–113, 433–436 (1954).

In 1969, Congress acknowledged the disparate treatment of the issuer and holder of debt obligations issued at a discount and decided there was no reason for the difference:

The present treatment of original issue discount results in a nonparallel treatment of the corporation issuing the bond and the person acquiring the bond. The corporation is allowed a deduction each year with respect to the discount. On the other hand, the holder is not required to report any income with respect to the original issue discount until he disposes of the bond. * * *

* * * * * * *

*Your committee does not believe there is a sound basis for treating the corporation issuing the bonds and the owners of the bonds in a different manner with respect to the original issue discount on the bond.* * * *

* * * *In general, your committee's bill provides that the bondholder and the corporation issuing the bond are to be treated in a consistent manner with respect to the original issue discount on the bond.* * * *

[H. Rept. 91–413, *supra* at 268–269; emphasis added.]

See S. Rept. 91–552, *supra* at 516–517; Conf. Rept. 91–782, *supra* at 662. Accordingly, as a part of the Tax Reform Act of 1969, Pub. L. 91–172, 83 Stat. 487, section 1232 was amended to provide that the holder of a debenture issued at a discount on or after May 28, 1969, would have to include the original issue discount in income ratably over the life of the debenture. H. Rept. 91–413, *supra* at 269, 389; S. Rept. 91–552, *supra* at 516; Conf. Rept. 91–782, *supra* at 662.

At the same time, Congress specifically addressed the question of whether original issue discount could arise where a debt

---

[2]All references to H. Rept. 91–413, S. Rept. 91–552, and Conf. Rept. 91–782 are to the pages in the Cumulative Bulletin where they were published.

obligation was issued after May 27, 1969, for property other than money. Section 1232(b)(1) generally defines original issue discount to be "the difference between the issue price and the stated redemption price at maturity." In the bill which was approved by the House and by the Senate Finance Committee, section 1232(b)(2), which defines issue price, would have been amended in relevant part to provide:

In the case of a bond or other evidence of indebtedness * * * as described in this paragraph, issued for property, the issue price of such bond or other evidence of indebtedness * * * shall be the fair market value of such property. [H.R. 13270, 91st Cong., 1st Sess., sec. 413(b) (1969).]

H. Rept. 91–413, *supra* at 269; S. Rept. 91–552, *supra* at 517.

When the bill was before the entire Senate, John S. Nolan, Deputy Assistant Secretary, Department of the Treasury, wrote a letter dated November 28, 1969, to Senator John J. Williams, a member of the Senate Finance Committee, pointing out that the definition of issue price in the bill did not carry out the intention of the committee and the Treasury Department. According to such letter, the problem arose because:

In the drafting of the bill on the House side, out of an abundance of caution, we defined "original issue discount" broadly to include cases where bonds were issued for property (as opposed to cash). The discount amount in such a case is equal to the excess of the face amount of the bonds over the fair market value of the property at the time of issuance of the bonds. Only recently, it has come to our attention that this may inadvertently open up a loophole in which the Government could be whipsawed, and that in any event it should not be the rule where bonds are issued in a tax-free reorganization. * * *

The whipsaw problem arises because of the severe difficulty of valuing property not traded on some recognized exchange. The issuing corporation will claim a low value for property received on issuance of its bonds in order to obtain a bond discount amortization deduction. The bondholder will claim that the property was worth the full face amount of the bonds so that he has no "original issue discount" income. It is not possible to bring these parties together in the same lawsuit, or otherwise to insure that consistent valuations are applied, so that if one party gets an ordinary deduction, the other has an equivalent amount of ordinary income. This would suggest there should be no original issue discount where bonds are issued for property except where the bonds are traded on an established securities market or are issued for property which consists of securities so traded. In these latter cases, the valuation problem (and thus the whipsaw danger) does not exist.

\*    \*    \*    \*    \*    \*    \*

We therefore recommend that a floor amendment be offered * * * substituting a rule that where a bond is issued for property other than cash, the issue price of the bond will be deemed to be the stated redemption price of the

bond at maturity except where such bond is part of an issue which is traded on an established securities market, or is issued for stock or securities which are traded on an established securities market. In the latter event, the value of the bond or the stock or securities for which it is issued on the established securities market will measure the amount of original issue discount for all purposes of the Internal Revenue Code. Further, original issue discount will not be deemed to exist where a bond is issued in a "reorganization" as defined in section 368 or sections 371–374 of the Code. [115 Cong. Rec. 36730–36731 (1969).]

At the request of Senator Williams, such letter was made a part of the Congressional Record. Senator Williams also offered an amendment of section 1232, which he reported had been approved by the Finance Committee. Such amendment carries out the Treasury recommendations and includes the restrictions on issue price when an indebtedness is issued for property other than money. The amendment was approved by the Senate and included in the bill as finally approved by the Congress. Conf. Rept. 91–782, *supra* at 662.

Subsequently, the Treasury regulations under section 1232 were amended to reflect the new statutory provisions defining issue price. At the same time, section 1.163–4(a)(1) was added to provide that the same definition is to be applied in determining whether an issuer is entitled to deduct discount on the issuance of debt obligations. In our judgment, such amendment is adequately justified by legislative history in which the legislative objective is clear beyond any reasonable doubt. On the one hand, Congress interceded in an existing controversy and made clear that, in some circumstances, a deduction for discount is to be allowed when debt obligations are issued in exchange for property, including even the securities of the issuer. On the other hand, Congress circumscribed the deduction by disallowing it becuase of the "whipsawing" possibility where neither the indebtedness nor the property has a readily established market value.

From such legislative history, it is abundantly clear that Congress was primarily concerned with curtailing the incongruous tax treatment of the issuer and holder of debt obligations issued at a discount. In that connnection, Congress specifically considered whether debt discount should be permitted where debt obligations are issued for property other than money. Under the House bill, issue price was broadly defined to allow original issue discount under such circumstances. However, the House approach was rejected because it created the possibility of

"whipsawing" as a result of issuers and holders taking inconsistent positions. In the legislation as finally enacted, Congress opted to redefine issue price to prevent such possibility. The practical effect of making the restrictions applicable only to the holder would be to frustrate the evident legislative objective and to reach the opposite result of that desired by the Congress. Not only would such result permit the issuer and holder to take inconsistent positions with respect to the very existence of the discount, but it would also place the Commissioner in a statutory whipsaw—the issuer could ignore section 1232(b)(2) and argue there was a large discount, whereas section 1232(b)(2) would foreclose the finding of a discount as to the holder. Under these circumstances, we cannot hold that it was unreasonable or arbitrary for the Commissioner to conclude that Congress intended the definition of issue price in section 1232(b)(2) to apply equally to the issuer and holder of debt obligations.

In addition, the Treasury regulations are supported by several cases dealing with debt obligations issued prior to May 28, 1969, in which the courts either assumed or held that the definition of issue price in section 1232(b)(2) applied to the issuer as well as to the holder. For example, in *Chock Full O' Nuts Corp. v. United States*, 453 F.2d 300 (1971), the Second Circuit had to decide whether the *issuer* of convertible bonds could allocate a portion of the issue price to the convertible feature and deduct the difference between the resulting issue price and the face amount of the bonds as original issue discount. During the course of the opinion, the Second Circuit stated:

> To determine whether that part of the issue price paid by the holder for the conversion privilege of a convertible bond constitutes original issue discount, as appellant here contends, we look to the Code and regulations defining that term. At the time of the issuance of the taxpayer's bonds in 1961, sec. 1232(b)(1) defined "original issue discount" to be "the difference between the issue price and the stated redemption price at maturity." "Issue price" was defined by sec. 1232(b)(2) to be "the initial offering price to the public at which price a substantial amount of such bonds or other evidences of indebtedness were sold." [453 F.2d at 302.]

The court applied such definition and held that the issuer was not entitled to allocate any amount to the conversion privilege and deduct it as discount. When the Court of Claims addressed a similar issue in *AMF Inc. v. United States*, 476 F.2d 1351, 1353 (1973), cert. denied 417 U.S. 930 (1974), it stated:

Of importance also is the matter of consistency of treatment of the parties to the transaction. Sec. 1232(b)(2) defines issue price as the initial offering price to the public, therefore, a holder of a debenture issued at par need not report any income from a "discount" resulting from the inclusion of a conversion feature. It would be inconsistent to permit the issuer of that same debenture to claim that the bond was sold at a discount.

* * * Since sec. 1232(b)(2) precludes the possibility of the holder recognizing a discount in the case of bond issued at par, consistency of treatment for all parties to the transaction directs that the issuer also be precluded from recognizing a discount for the same bond. * * *

See also *Commissioner v. Nat. Alfalfa Dehydrating & Milling Co.*, 417 U.S. at 144–145 and n. 8; *Danly Machine Corp. v. United States*, 492 F.2d 30 (7th Cir. 1974); *Hunt Foods & Industries, Inc. v. Commissioner*, 57 T.C. 633 (1972), affd. per curiam 496 F.2d 532 (9th Cir. 1974). Moreover, it is clear that Congress also assumed that the definition of issue price in section 1232(b)(2) applied generally to the transaction. H. Rept. 91–413, *supra* at 269; S. Rept. 91–552, *supra* at 517.

Finally, the petitioner's reliance on *Commissioner v. Nat. Alfalfa Dehydrating & Milling Co., supra,* and *Cities Service Co. v. United States, supra,* is misplaced. Those cases involved debt obligations issued before 1969, the effective date of the amendments made by the Tax Reform Act of 1969 in which Congress modified the tax treatment of such obligations when they are issued in exchange for property. 417 U.S. at 144–145 and n. 8; 552 F.2d at 1284.

The petitioner requests that we determine the value of the debentures when issued. However, not only were such debentures and the stock of the petitioner not traded on an established securities market, but also the petitioner presented no evidence of any arm's-length sales of the debentures or stock. Thus, it asks that we determine the value of the debentures based on an analysis of comparable organizations, general economic conditions, its financial condition, and the financial market. A determination of the value of the debentures based on such evidence would be highly arguable and precisely the kind of inquiry the 1969 amendment of section 1232(b) was designed to avoid. Since the Commissioner argues, and we agree, that under the regulations the value of the debentures is immaterial, and since we conclude that the regulations are valid, we decline to pass on the value of the debentures.

The second issue for decision is whether the petitioner is

entitled to amortize and deduct the 20-percent call premium which would be due if it redeems the debentures at the earliest call date, that is, between August 15, 1981, and July 31, 1982. It asserts that historically accountants have arrived at income by amortizing a call premium payable on corporate debentures and deducting it as interest over a period commencing with the date the debentures were issued and ending on the first call date. The petitioner suggests that in the event the debentures are not in fact called on the first call date, it would be required to recapture the deductions previously taken by reporting them ratably as income over the term remaining to maturity. The Commissioner argues that the petitioner, which is an accrual method taxpayer, is not entitled to the interest deduction because it was not obligated to redeem the debentures prior to maturity.

Section 461(a) provides the general rule that a deduction shall be taken in the proper taxable year under the method of accounting used by the taxpayer in computing taxable income. In the case of a taxpayer who uses an accrual method of accounting, an expense is properly accruable and deductible by the taxpayer in the year when all the events have occurred which fix the fact of liability and the amount thereof can be determined with reasonable accuracy. Sec. 1.461–1(a)(2), Income Tax Regs.; *United States v. Consolidated Edison Co.*, 366 U.S. 380, 385 (1961); *Dixie Pine Products Co. v. Commissioner*, 320 U.S. 516 (1944); *United States v. Anderson*, 269 U.S. 422, 441 (1926). Determining whether such conditions exist requires an examination and evaluation of the facts and circumstances of the case. *Subscription Television, Inc. v. Commissioner*, 532 F.2d 1021, 1027 (5th Cir. 1976), affg. a Memorandum Opinion of this Court; *Lozano, Inc. v. Commissioner*, 68 T.C. 366, 370 (1977). In this case, we agree with the Commissioner that the call premium is contingent and therefore not amortizable and accruable.

Here, the petitioner was not required to call the debentures at any time prior to maturity; rather, under the indenture, the petitioner could call the debentures *at its option* between August 15, 1981, and July 31, 1986. If the debentures are not called before maturity, the petitioner is required to pay no premium, and if they are called, the amount of the premium will depend upon the time of the call. Under such circumstances, all the events which give rise to a fixed and unconditional obligation

simply have not occurred in the years at issue. See *Trinity Construction Co. v. United States,* 424 F.2d 302, 305 (5th Cir. 1970).

The petitioner's reliance on *Cities Service Co. v. United States, supra,* is misplaced. In *Cities Service,* the issuer, which also used an accrual method of accounting, failed to claim a deduction for its amortizable original issue discount until it had repurchased the debentures several years after they had been issued. The issuer argued that "debt discount may be amortized and deducted over the life of the debentures or it may be recovered in the year of premature retirement through repurchase (or, as a logical extension of this, even at maturity)." 522 F.2d at 1292. The Second Circuit rejected the argument holding that since Cities Service used an accrual method of accounting, it was required to amortize the debt discount and to take deductions annually over the life of the indebtedness. 552 F.2d at 1292–1293. That holding involved the amortization of original issue discount, not premium, which the issuer would be required to pay eventually, and therefore, such holding has no applicability to the issue of the amortization and deductibility of the premium in this case.

The petitioner also maintains that the provisions of sections 171 and 249 support its position. Section 171 allows certain persons who purchased bonds at a premium to amortize and deduct such premium. Section 249 limits the premium which is deductible by an issuer who reacquires its bonds. Those sections do not at all support the petitioner's position. In the case of section 171, a premium has been paid; it does not deal with the mere possibility of paying a premium. In the case of section 249, it merely limits the premium which is deductible, but it does not relate to the question of when the premium is deductible. Accordingly,

*Decision will be entered under Rule 155.*