INDIANAPOLIS LIFE INSURANCE
COMPANY AND SUBSIDIARY,
Plaintiff,

v.

UNITED STATES of America, Defendant.
No. IP 95–0770–C H/G.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Sept. 30, 1996.

Matthew J. Zinn, Steptoe & Johnson, Washington, DC, Theodore R. Groom, Groom & Nordberg, Washington, DC, and Theodore J. Nowacki, Bose McKinney & Evans, Indianapolis, IN, for plaintiff.

Richard J. Gagnon, Jr., United States Department of Justice, Washington, DC, and Jeffrey L. Hunter, Assistant United States Attorney, Indianapolis, IN, for defendant.

William B. Harman, Jr., Davis & Harman, Washington, DC, and James W. Riley, Jr., Riley, Bennett & Egloff, Indianapolis, IN, for amicus curiae The Stock Company Information Group.

## AMENDED ENTRY ON CROSS–MOTIONS FOR SUMMARY JUDGMENT *

HAMILTON, District Judge.

This case is only the most recent round in the economic and political competition between two segments of the life insurance industry—mutual life insurance companies and stock life insurance companies. In 1984, Congress rewrote § 809 of the Internal Revenue Code, 26 U.S.C. § 809, to address what it perceived to be an unfair difference between the taxation of income of mutual life insurance companies and stock life insurance companies. As explained in detail below, the chosen solution provides a case study in the law of unintended consequences. Things have not turned out quite the way Congress, the stock companies, the mutual companies, or the Internal Revenue Service expected. That presents a challenge for courts whose task is to give effect to the "intent" of Congress as expressed in the statutory language approved by both Houses of Congress and signed by the President.

The precise issue here, although its statement is meaningless without detailed explanation, is whether the computations made pursuant to 26 U.S.C. § 809(f)(2), according to the terms of § 809(f)(3) and § 809(c)(1), require recognition of a negative "recomputed differential earnings rate." The government and the stock life insurance companies won the first round in the Court of Appeals for the Eighth Circuit, which held in *American Mutual Life Ins. Co. v. United States,* 43 F.3d 1172 (8th Cir.1994), that the computa-

---

* This Amended Entry corrects and amends this court's original Entry issued August 6, 1996, pursuant to suggestions made by the parties.

tions made pursuant to § 809(f)(2) need not recognize a negative recomputed differential earnings rate. The plaintiff in this case, Indianapolis Life Insurance Company ("Indianapolis Life"), a mutual life insurance company, asks this district court to disagree with the Eighth Circuit on precisely the same issue under § 809. Indianapolis Life seeks tax refunds for the years 1987 and 1984 (as a result of an operations loss carryback from 1987), although the refunds it seeks are all based on application of § 809 to its operations in 1986. The parties have filed cross-motions for summary judgment, and the court heard oral argument.[1] As explained below, this court agrees with the result reached by the Eighth Circuit, although for different reasons. Accordingly, the court grants the government's motion for summary judgment and denies Indianapolis Life's motion for summary judgment.

## Background

At the center of this case is a critical difference, for income tax purposes, between stock life insurance companies and mutual life insurance companies. Stock life insurance companies raise equity capital from stockholders, and they sell their insurance policies to policyholders. When a stock life insurance company earns money on its investments and operations, it can choose to make its policies more attractive to buyers by distributing some of its earnings to policyholders in the form of premium rebates or increased policy benefits. For tax purposes, such policyholder dividends of a stock life insurance company are essentially no different from any price rebate that any business might offer its customers. The stock insurance company may therefore deduct the amount of such policyholder dividends from the company's taxable income. See 26 U.S.C. § 808(c). The stock life insurance company cannot use all of its earnings for such policyholder benefits, however, for it must also try to provide stockholders with a return on their equity investment. Unlike policyholder dividends or benefits, earnings that benefit the stockholders are treated as

taxable income for the stock life insurance company.

Because stock life insurance companies' benefits to policyholders and earnings for stockholders are paid to two distinct groups of people, there is a sharp line between the two and it is (relatively) easy to keep them separate for income tax purposes. Mutual life insurance companies present an income tax problem because they do not have stockholders. The owners of mutual companies are the policyholders themselves. Therefore, mutual life insurance companies pay no stockholder dividends. Instead, policyholders receive the benefit of any earnings from investments or operations. They generally receive some of these benefits in the form of increased policy benefits or premium rebates as policyholder dividends. Unlike the dividends paid to stockholders by stock companies, to the extent that policyholder dividends are used to distribute returns roughly comparable to return on owners' equity, those equity returns are not directly accounted for or identified.

Before 1984, mutual companies generally could deduct all or most of their policyholder dividends for federal income tax purposes. Stock life insurance companies had long contended that this feature of federal income tax laws gave mutual life insurance companies an unfair competitive advantage against stock companies. The stock companies argued that if a mutual company can deduct all of its policyholder dividends, without having to pay out any return on equity capital, the mutual insurance company avoids paying taxes on earnings that are the substantial equivalent of the taxable earnings of stock insurance companies. The issue has long been the subject of legislative struggles between the two segments of the industry. In 1984, the stock companies won a significant victory when Congress completely rewrote § 809 to address this issue.

## Section 809

As amended in 1984, § 809 is one of the relatively complex provisions of the Internal Revenue Code. This case is about one of the

---

**1.** The Stock Company Information Group, an unincorporated association comprised of 19 of the largest stock life insurance companies in the

United States, filed a brief in this case as *amicus curiae* in support of the government's position.

key details of § 809, but the details are unintelligible without an understanding of the section's general concept. The idea at the core of § 809 is that because stock and mutual companies are competitors in the same industry, they can be expected to earn, on average, comparable rates of return on their equity. Congress observed in 1984, however, that "the average pre-tax return on equity of mutual companies falls below that for a comparable group of stock companies." H.R.Rep. No. 432, 98th Cong., 2d Sess., pt. 2, at 1422 (1984) ("House Report"), *reprinted in* 1984 U.S.C.C.A.N. 697, 1067. This observation led Congress to conclude that policyholder dividends paid by mutual insurance companies have two distinct economic components: they include both a benefit to the policyholder, which is comparable to a stock company's tax-deductible policyholder dividend and necessary to compete with the stock company, and an additional amount that is the rough equivalent of the stock company's non-deductible earnings for its stockholders. See *id.*

Thus, the working assumption of § 809 is that the earnings rate for stockholders on the stock side of the industry (which does not include policyholder dividends) will be lower than the total earnings rate on the mutual side of the industry (which includes policyholder dividends). Congress recognized that "there is no precise way to segregate a policyholder dividend" into these separate components for the mutual side of the industry. House Report at 1422; 1984 U.S.C.C.A.N. at 1067. Section 809 uses the average earnings rate for the stock side of the industry to impute a comparable earnings rate to mutual life insurance companies for purposes of calculating their taxable income. Section 809 requires the government to review reported earnings data for both the stock side of the life insurance industry and the mutual side and calculate an average for each group. The idea behind § 809 is that the reported earnings of stock companies should be higher than the reported earnings of mutual companies, and that the difference is caused by the extra incentive that mutual companies have

to offer policyholder dividends. The government then compares the two different averages to impute a certain level of additional income to mutual companies. Then, through a series of calculations using these figures, the permissible deduction for policyholder dividends is calculated for each mutual company.

As written to apply to the real world, however, § 809 is considerably more complex. The details of the calculations may induce the reader's eyes to glaze over, but they are critical to understanding the issue in dispute here.[2] To reach § 809, we begin in § 808 of the Internal Revenue Code, which permits life insurance companies to deduct from their taxable income "policyholder dividends." Section 808(c) provides for the amount of the deduction:

> (1) In general. Except as limited by paragraph (2), the deduction for policyholder dividends for any taxable year shall be an amount equal to the policyholder dividends paid or accrued during the taxable year.

> (2) Reduction in Case of Mutual Companies. In the case of a mutual life insurance company, the deduction for policyholder dividends for any taxable year shall be reduced by the amount determined under section 809.

Section 809 states its general rule in subparagraph (a)(1): "In the case of any mutual life insurance company, the amount of the deduction allowed under Section 808 shall be reduced (but not below zero) by the differential earnings amount." It then defines "differential earnings amount" in subparagraph (a)(3):

> For purposes of this section, the term "differential earnings amount" means, with respect to any taxable year, an amount equal to the product of—

> > (A) the life insurance company's average equity base for the taxable year, multiplied by

> > (B) the differential earnings rate for such taxable year.

---

2. The parties report that several billion dollars in tax payments depend on the issue in dispute, and that fact may have helped them maintain their admirable concentration here. Counsel for both sides have presented their positions clearly and persuasively.

This case concerns the "differential earnings rate;" there is no dispute here concerning the "average equity base." Section 809(c)(1) defines "differential earnings rate":

> For purposes of this section, the differential earnings rate for any taxable year is the excess of—
>
> > (A) the imputed earnings rate for the taxable year, over
> >
> > (B) the average mutual earnings rate for the second calendar year preceding the calendar year in which the taxable year begins.

To make sense of this definition, then, we need to understand how to calculate the "imputed earnings rate" and the "average mutual earnings rate."

Section 809(d), which defies accurate summary, sets forth the mechanism for determining the "imputed earnings rate":

> (d) Imputed earnings rate. (1) In general. For purposes of this section, the imputed earnings rate for any taxable year is—
>
> (A) 16.5 percent in the case of taxable years beginning in 1984, and
>
> (B) in the case of taxable years beginning after 1984, an amount which bears the same ratio to 16.5 percent as the current stock earnings rate for the taxable year bears to the base period stock earnings rate.
>
> (2) Current stock earnings rate. For purposes of this subsection, the term "current stock earnings rate" means, with respect to any taxable year, the average of the stock earnings rates determined under paragraph (4) for the 3 calendar years preceding the calendar year in which the taxable year begins.
>
> (3) Base period stock earnings rate. For purposes of this subsection, the base period stock earnings rate is the average of the stock earnings rates determined under paragraph (4) for calendar years 1981, 1982, and 1983.
>
> (4) Stock earnings rate. (A) In general. For purposes of this subsection, the stock earnings rate for any calendar year is the numerical average of the earnings rates of the 50 largest stock companies.
>
> (B) Earnings rate. For purposes of subparagraph (A), the earnings rate of any stock company is the percentage (determined by the Secretary) which—
>
> (i) the statement gain or loss from operations for the calendar year of such company, is of
>
> (ii) such company's average equity base for such year.
>
> (C) 50 largest stock companies. For purposes of this paragraph, the term "50 largest stock companies" means a group (as determined by the Secretary) of stock life insurance companies which consists of the 50 largest domestic stock life insurance companies which are subject to tax under this part. The Secretary—
>
> (i) shall, for purposes of determining the base period stock earnings rate, exclude from the group determined under the preceding sentence any company which had a negative equity base at any time during 1981, 1982, or 1983,
>
> (ii) shall exclude from such group for any calendar year any company which has a negative equity base, and
>
> (iii) may by regulations exclude any other company which otherwise would have been included in such group if the inclusion of the excluded company or companies would, by reason of the small equity base of such company, seriously distort the stock earnings rate.
>
> The aggregate number of companies excluded by the Secretary under clause (iii) shall not exceed the excess of 2 over the number of companies excluded under clause (ii).
>
> (D) Treatment of affiliated groups. For purposes of this paragraph, all stock life insurance companies which are members of the same affiliated group shall be treated as one stock life insurance company.

Under subsection (d), the most important feature is the "stock earnings rate"—the numerical average of the earnings rates of the 50 largest stock insurance companies. For each calendar year, the IRS calculates the "current stock earnings rate" as defined in subsection (d)(2). It is critical to note that this "current stock earnings rate" for a taxable year is actually the average of the stock earnings rates for the three preceding calendar years. 26 U.S.C. § 809(d)(2). (Congress explained that it used the three year average "to preclude the possibility of sharp rises or declines in the rate of return for the stock segment of the industry, giving the mutual companies some ability to plan for and predict tax costs for purposes of marketing their products." House Report at 1423; 1984 U.S.C.C.A.N. at 1068.)

However, the "current stock earnings rate" is not used directly in calculating the imputed earnings rate. First, it must be adjusted pursuant to subsection (d)(1), which is based on a ratio between the "current stock earnings rate" and the "base period stock earnings rate," which is based on the average of the stock earnings rates for calendar years 1981, 1982, and 1983. In 1986 the IRS determined that the ratio between 16.5 percent and the base period stock earnings rate was 90.55 percent. Rev.Rul. 86–114, 1986–2 C.B. 96, modified and superseded, Rev.Rul. 86–157, 1986–2 C.B. 96. As a result, the "imputed earnings rate" for any year after 1984 becomes 90.55 percent multiplied by the current stock earnings rate.

Recall that the differential earnings rate is "the excess of—(A) the imputed earnings rate for the taxable year, over (B) the average mutual earnings rate for the second calendar year preceding the calendar year in which the taxable year begins." 26 U.S.C. § 809(c)(1). After calculating the imputed earnings rate, we must determine the average mutual earnings rate. Subsection (e) provides the mechanism: The IRS must determine "the aggregate statement gain or loss from operations for such year of domestic mutual life insurance companies," then determine "their aggregate average equity bases for such year." The quotient, stated as a percentage, becomes the "average mutual earnings rate" for the year. Thus, under

§ 809, the deduction for policyholder dividends paid by mutual life insurance companies is the amount actually paid or accrued, reduced by the product of this formula: [ (Current stock earnings rate) × (0.9055) − Average mutual earnings rate] × (Average equity base).

The first serious complication here arises from the fact that the calculation uses the "current" stock earnings rate, but the average mutual earnings rate is for the second preceding calendar year. Congress explained that this feature was necessary "because, for any taxable year, the Secretary will not have the data required to determine the average mutual earnings rate prior to the date a mutual company will file its Federal income tax return." House Report at 1425, 1984 U.S.C.C.A.N. at 1070. To accommodate this problem, Congress included § 809(f), which requires that on its tax return for the next taxable year, the mutual company must recompute for the original year the "differential earnings amount" (the magic number that is used to increase the company's taxable income) using the average mutual earnings rate for the calendar year in which the original taxable year began. Sections 809(f)(1) and (f)(2) require comparison of the "differential earnings amount" as first calculated for the year with the "recomputed differential earnings amount." Section 809(f)(3) instructs:

> For purposes of this subsection, the term "recomputed differential earnings amount" means, with respect to any taxable year, the amount which would be the differential earnings amount for such taxable year if the average mutual earnings rate taken into account under subsection (c)(1)(B) were the average mutual earnings rate for the calendar year in which the taxable year begins.

This provision thus permits use of the actual earnings of mutual companies during the relevant year for calculation of the recomputed differential earnings amount for that year. Thus, the ultimate effect of § 809 for a given year of operations is based on a comparison of the average mutual earnings rate for the taxable year against the average earnings for

large stock companies over the three preceding years (as adjusted by the 90.55 percent index). That is, the effect of § 809 on Indianapolis Life's operations in 1986 was based on a comparison of the average mutual earnings rates in 1986 with the average earnings rate of the 50 largest stock companies in 1983, 1984, and 1985.

This complication has apparently played a major role in producing the unintended consequences of § 809. In drafting § 809, Congress "determined that the average pre-tax return on equity of mutual companies falls below that for a comparable group of stock companies." House Report at 1422; 1984 U.S.C.C.A.N. at 1067. While that may be true as a general rule, at least if earnings are compared for identical time periods, in the actual application of the more complex provisions of § 809, the applicable "imputed earnings rate" has not been consistently higher than the average mutual earnings rate. As earnings rates have varied from year to year and as stock earnings have been subject to the 90.55 percent index feature, the average mutual earnings rate has been higher than the imputed earnings rate not only for 1986, but also for 1989, 1991, 1992, and 1993. See Rev.Rul. 91–52, 1991–2 C.B. 331; Rev.Rul. 93–59, 1993–2 C.B. 245; Rev.Rul. 94–53, 1994–2 C.B. 162; Rev.Rul. 95–60, Daily Tax Report (BNA) (Aug. 10, 1995) at L–2. If a negative recomputed-differential rate is recognized in the calculations performed pursuant to § 809(f)(2), that rate would allow a mutual company to deduct more for the relevant year than it actually paid or accrued in policyholder dividends in that year.

A second significant complication here arises from the fact that despite its title—"Reduction in certain deductions of mutual life insurance companies"—§ 809 has the effect of imputing taxable income to a mutual insurance company regardless of the amount a mutual insurance company actually pays in policyholder dividends and regardless even of whether it pays any dividends at all. This effect is the result of § 809(a)(2), which provides: "In the case of any mutual life insurance company, if the differential earnings amount exceeds the amount allowable as a deduction under Section 808 for the taxable year (determined without regard to this sec-

tion), such excess shall be taken into account under subsections (a) and (b) of Section 807." Section 808(c) limits the deduction for policyholder dividends to "an amount equal to the policyholder dividends paid or accrued during the taxable year." Thus, if § 809 produces a "reduction" in the permissible policyholder dividend deduction below the amount the taxpayer actually paid or accrued, the excess is treated as a decrease in the company's reserves, which is effectively treated as additional gross income under § 807(a) or (b).

### The Taxpayer's Claim for Refund

The issue in this case arose based on the following calculations by Indianapolis Life. On its 1986 federal income tax return, Indianapolis Life reported that it had paid or accrued policyholder dividends totaling $20,940,502 for 1986. Pursuant to § 809, Indianapolis Life calculated a differential earnings rate of 10.539 percent by subtracting the average mutual earnings rate for 1984 of 5.746 percent from the 1986 "imputed earnings rate" of 16.285 percent. The differential earnings rate of 10.539 percent was multiplied by Indianapolis Life's average equity base for 1986, ($99,340,525, as adjusted after audit), to produce a differential earnings amount of $10,469,498. Simple subtraction produced the deduction for policyholder dividends of $10,471,004 on the 1986 tax return.

During 1987, the IRS calculated that the average mutual earnings rate for 1986 was 17.980 percent, which was higher than the 16.285 percent imputed earnings rate. On its (amended) return for 1987, Indianapolis Life reported a "recomputed differential earnings amount" of negative $1,683,822. Because the average mutual earnings rate calculated for 1986 was higher than the 1986 imputed earnings rate, Indianapolis Life claimed on its 1987 return a further policyholder dividend deduction for 1986 of $12,153,320. That figure is the difference between the differential earnings amount of $10,469,498 stated on the 1986 return and the recomputed differential earnings amount of negative $1,683,822. The government points out that Indianapolis Life is therefore seeking to take policyholder dividend deductions for 1986 totalling $22,624,-

324, which is more than the $20,940,502 in policyholder dividends that Indianapolis Life actually paid or accrued during 1986. The government disallowed $1,683,822 of the deduction claimed on the 1987 return. Indianapolis Life now seeks a refund totaling $795,263, plus interest.

## Summary Judgment Standard

Summary judgment should be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *E.g., Glass v. Dachel,* 2 F.3d 733, 740 (7th Cir.1993). The fact that the parties have filed cross-motions for summary judgment does not affect the applicable standard. *E.g., I.A.E., Inc. v. Shaver,* 74 F.3d 768, 774 (7th Cir.1996); *Heublein, Inc. v. United States,* 996 F.2d 1455, 1461 (2d Cir.1993). In this case, the material facts relevant to the parties' motions are not in dispute. The case turns on the interpretation of a statute; thus it is properly resolved on a motion for summary judgment. *E.g., LTV Steel Co., Inc. v. Northwest Eng'g & Constr., Inc.,* 41 F.3d 332, 334 (7th Cir.1994).

■ The court has before it affidavits and deposition testimony of several expert witnesses. Plaintiff submitted affidavits from Dr. Michael J. Boskin, a professor of economics at Stanford University who has also served as Chairman of the Council of Economic Advisors, and Julius Vogel, FSA, MAAA, an actuary and expert in the life insurance industry. The government moved to strike those affidavits. After that motion was denied, the government submitted an affidavit from Dr. Neil Doherty, a professor at the Wharton School of the University of Pennsylvania, and an affidavit from Christian DesRochers, FSA, MAAA, an actuary and consultant for the life insurance industry. Plaintiff took the depositions of Dr. Doherty and Mr. DesRochers, and those transcripts and a supplemental affidavit from Dr. Boskin have also been filed with the court.

The issues raised by the government's motion to strike and the role that these experts' affidavits and testimony have played in the court's decision deserve additional explanation. As the court indicated in its order denying the government's motion to strike, the court holds the view that the parties should be permitted to establish the record of evidence as they see fit, especially as plaintiff pursues a circuit split here. However, as the government points out, interpretation of § 809 is a question of law. It would be unusual, to say the least, for a court to decide how to interpret a statute after a trial in which the court heard conflicting expert testimony and decided as a matter of fact which expert's testimony deserved greater weight.[3] But that is not how the court has used the expert evidence here. The specific statutory question here is presented in a tax and business context that is, to risk considerable understatement, complex and unfamiliar to the layperson. A judge of a court of broad jurisdiction who ventures into the intricacies of the federal taxation of insurance companies should not try to learn from experts in the field how to interpret a statute, but such a judge may learn from these experts how different interpretations of a statute or regulation may actually operate in this complex and unfamiliar environment.

Therefore, what is most helpful for this case is the common ground shared by the experts on both sides. That common ground helps provide an appropriate foundation for deciding the parties' cross-motions for summary judgment. Where the experts disagree, it is quite clear that their disagreements are primarily the product of divergent views about the purpose of § 809. When those disagreements are filtered out, there is a great deal of valuable knowledge in these experts' affidavits and depositions. For the court to ignore what these experts can teach it would be an exercise of judicial hubris. All four experts deserve respect and thanks for their candor and their expertise.

## The Merits

■ The specific issue here is whether § 809 of the Internal Revenue Code allows recognition of a negative number as the re-

---

3. "The meaning of federal regulations is not a question of fact, to be resolved by a jury after a battle of the experts. It is a question of law, to be resolved by the court." *Bammerlin v. Navistar Int'l Transp. Corp.,* 30 F.3d 898, 900 (7th Cir.1994).

computed differential earnings amount in the calculation of a mutual life insurance company's tax deductions. The government contends that negative recomputed differential earnings amounts should not be recognized. The government argues that Congress intended § 809 to reduce deductions allowed to mutual insurance companies and that mutual companies should not be allowed to deduct more than the total policyholder dividends they paid or accrued in a given year. Under this interpretation, the statute should not take into account negative recomputed differential earnings amounts. Indianapolis Life argues that Congress intended § 809 to provide equitable taxation of stock and mutual companies on average, over time. Under this reading, the statute should take into account negative recomputed differential earnings amounts.

## I. The Language of Section 809

Section 809(f)(2) states: "In the case of any mutual life insurance company, if—(A) the differential earnings amount determined under this section for any taxable year, exceeds (B) the recomputed differential earnings amount for such taxable year, such excess shall be allowed as a life insurance deduction for the succeeding taxable year." Section 809(f)(3) instructs that the "recomputed differential earnings amount" for a taxable year is the amount that would be the "differential earnings amount" for the year if the average mutual earnings rate taken into account in subsection (c)(1)(B) were the average mutual earnings rate for the calendar year in which the taxable year begins, rather than the rate for the second preceding year. Section 809(c)(1) provides:

> For purposes of this section, the differential earnings rate for any taxable year is the excess of—
> (A) the imputed earnings rate for the taxable year, over
> (B) the average mutual earnings rate for the second calendar year preceding the calendar year in which the taxable year begins.

Much argument has focused on the "plain meaning" of the word "excess" in § 809(c)(1). The government argues that the plain meaning indicates that "excess" can have only a positive (not less than zero) value.

The government asserts first that the most natural reading of the term "excess" in this context is limited to positive values; if the "excess" of one number over a second number produces a negative number, then the first did not exceed the second at all. The government also notes that the title of § 809 is "Reduction in certain deductions of mutual life insurance companies," yet recognition of negative differential earnings rates would actually allow mutual companies to increase their policyholder dividend deductions under some circumstances, including those presented here. To support its plain language argument, the government also relies on the interplay between § 809 and § 808(c). Section 808(c) provides:

> (c) Amount of deduction. (1) In general. Except as limited by paragraph (2), the deduction for policyholder dividends for any taxable year shall be an amount equal to the policyholder dividends paid or accrued during the taxable year.
>
> (2) Reduction in case of mutual companies. In the case of a mutual life insurance company, the deduction for policyholder dividends for any taxable year shall be reduced by the amount determined under section 809.

The government argues that recognizing negative differential earnings rates would violate § 808(c) by allowing mutual companies a deduction for policyholder dividends greater than the dividends they actually paid or accrued during the year. The Eighth Circuit apparently agreed with the government's plain language argument in *American Mutual*, concluding that the term "excess" is "more susceptible to a reading as a positive number than as a negative number." 43 F.3d at 1175.

For several reasons, this court does not believe the language of the statute is so plain as to control the issue here. First, the most telling evidence that the language is not "plain" is the fact that the IRS itself has completely reversed course on the precise issue before the courts. Second, in the context of this particular issue, it simply is not clear that "excess" must be limited to posi-

tive numbers, and Congress did not include in § 809(c)(1) or (f)(3) the type of clarifying language it has often used when it intends to limit such a number to positive values. Third, the focus on the "reduction" of mutual companies' policyholder dividend deduction does not fully and accurately describe the effects of the statute. Fourth, it is not clear that the limiting language in § 808(c) prohibits recognition of a negative excess.

(1) The government's plain language argument is seriously undermined by the fact that the Internal Revenue Service itself initially declared a recomputed differential earnings rate for 1986 of "− 1.700 percent." This negative recomputed differential earnings rate was published by the IRS in Announcement 88–47, 1988–12 I.R.B. 56. While the IRS is entitled to make a mistake and correct it every now and then, see *Dickman v. Commissioner*, 465 U.S. 330, 343, 104 S.Ct. 1086, 1093, 79 L.Ed.2d 343 (1984), the fact that the IRS initially and publicly agreed with plaintiff's position supports the contention that "excess" as used in § 809(c)(1) can reasonably be interpreted to permit a negative value.

(2) Indianapolis Life points out that, unlike many other provisions in the Internal Revenue Code that might present similar issues, § 809(c)(1) does not contain explicit limitations, such as the phrase "but not less than zero." Indianapolis Life also offers expert witness affidavits by Dr. Boskin and Mr. Vogel indicating that "excess" can have a negative (less than zero) value in the life insurance industry in particular and in mathematics and economics more generally.

The Internal Revenue Code includes other provisions that might present similar issues but resolve them through clear statutory language. For example, § 818(c)(1) states that the gain on the disposition of property a life insurance company has owned since before 1959 equals: "an amount (*not less than zero*) equal to the amount by which the gain ... *exceeds* the difference between the fair market value on December 31, 1958, and the adjusted basis for determining gain as of such date." 26 U.S.C. § 818(c)(1) (emphasis added). Similarly, former § 804(a)(2) provided that taxable investment income could be

"an amount (*not less than zero*) equal to" certain income items less specified deductions. 26 U.S.C. § 804(a)(2) (1982) (emphasis added) (*amended by* 26 U.S.C. § 804 (1984)). In other provisions of the Code, the same effect is achieved by statutory language calling for the computation of "the amount (*if any*)" by which one number exceeds another. 26 U.S.C. § 804(b)(2) (1982) (emphasis added) (*amended by* 26 U.S.C. § 804 (1984)); 26 U.S.C. § 809(f)(1) (1982) (emphasis added) (*amended by* 26 U.S.C. § 809 (1984)). In fact, the current version of § 809 includes a similarly explicit restriction: "In the case of any mutual life insurance company, the amount of the deduction allowed under Section 808 shall be reduced (*but not below zero*) by the differential earnings amount." § 809(a)(1) (emphasis added). As Indianapolis Life points out, § 809(c)(1) conspicuously lacks such language that would clearly resolve the question presented here.

The parties' arguments suggest there are two "plain meanings" to be examined—plain meaning as understood by a lay person and plain meaning as understood by an expert in a specialized industry. Indianapolis Life argues that Code provisions applicable to taxation of life insurance companies have been drafted in language peculiar to the industry and should be interpreted in light of the meaning generally attributed to the language by experts in the specialized industry. Indianapolis Life quotes Justice Frankfurter in support of this view:

> If a statute is written for ordinary folk, it would be arbitrary not to assume that Congress intended its words to be read with the minds of ordinary men. If they are addressed to specialists, they must be read with the minds of specialists.

Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum.L.Rev. 527, 536–37 (1947). Indianapolis Life then looks to Dr. Boskin and Mr. Vogel to provide the expert plain meaning. Dr. Boskin states that in economics, finance, and mathematics, the excess of a smaller number over a larger number is a negative number. Mr. Vogel explains that negative values are commonly recognized in the insurance industry.

The government advocates consideration of lay plain meaning, citing the general rule of statutory interpretation that unless otherwise defined, words will be interpreted in accordance with their ordinary, contemporary, common meaning. The government then looks to the dictionary definitions of "excess": "the amount or degree by which one thing or number exceeds another," and "exceed": "to be greater than." Webster's Third New International Dictionary at 792 (1969). The government also cites *American Mutual* and other cases for the proposition that language used in the tax code should be read in its ordinary and natural sense. See *American Mutual*, 43 F.3d at 1175 (quoting *Helvering v. San Joaquin Fruit & Investment Co.*, 297 U.S. 496, 499, 56 S.Ct. 569, 570–71, 80 L.Ed. 824 (1936); see also *Commissioner v. Soliman*, 506 U.S. 168, 174, 113 S.Ct. 701, 705–06, 121 L.Ed.2d 634 (1993) (referring to Webster's Third New International Dictionary to find the common sense meaning of the term "principal place of business" in § 280A(c)(1) of the tax code).

▆▆▆ Any statutory language must be read and interpreted in context. The term "excess" used in § 809(c)(1) for purposes of applying § 809(f)(2) is used in a specialized and complex tax and business context. In that context, the term "excess" can reasonably be interpreted as limited to positive values. It can also reasonably be interpreted to include both positive and negative values. "A dictionary collects standard usages, but it does not set limits on the scope of language. Both the linguistic and the functional contexts of words offer better clues to meaning than do dictionaries." *Public Hospital of Town of Salem v. Shalala*, 83 F.3d 175, 177 (7th Cir.1996). In context, the term "excess" does not have a single "plain" meaning, and this case, at least, cannot be decided by referring to a dictionary.

(3) Both the government and the Eighth Circuit focus on the expressed intent to "reduce" the policyholder dividend deductions of mutual companies. That focus overlooks an important aspect of § 809. Section 809 applies regardless of the reasons for any differences in earnings rates between stock and mutual companies. In fact, although § 809 is written so as to center most attention on the mutual company's deduction for policyholder dividends, the net effect of § 809 on a mutual company's taxes does not depend at all on the amount that a mutual company pays in policyholder dividends, or even on whether it pays any policyholder dividends at all. As discussed above, this feature is the result of § 809(a)(1) & (2). Those provisions state the general rule:

(a) General rule. (1) Policyholder dividends. In the case of any mutual life insurance company, the amount of the deduction allowed under section 808 shall be reduced (but not below zero) by the differential earnings amount.

(2) Reduction in reserve deduction in certain cases. In the case of any mutual life insurance company, if the differential earnings amount exceeds the amount allowable as a deduction under section 808 for the taxable year (determined without regard to this section), such excess shall be taken into account under subsections (a) and (b) of section 807.

Under this language, if the "differential earnings amount" exceeds a taxpayer's deduction for policyholder dividends (or even if no dividends were paid), "such excess shall be taken into account under subsections (a) and (b) of section 807." Subsections (a) and (b) of § 807 state the general rule for treatment of a figure calculated under subsection (c), which includes life insurance reserves and certain other amounts. Subsections (a) and (b) of § 807 explain how any excess under subsection 809(a)(2) shall be treated:

(a) Decrease treated as gross income. If for any taxable year—

(1) the opening balance for the items described in subsection (c), exceeds

(2)(A) the closing balance for such items, reduced by

(B) the sum of (i) the amount of the policyholders' share of tax-exempt interest, plus (ii) any excess described in section 809(a)(2) for the taxable year, such excess shall be included in gross income under section 803(a)(2).

(b) Increase treated as deduction. If for any taxable year—

(1)(A) the closing balance for the items described in subsection (c), reduced by (B) the sum of (i) the amount of the policyholders' share of tax-exempt interest, plus (ii) any excess described in section 809(a)(2) for the taxable year, exceeds

(2) the opening balance for such items,

such excess shall be taken into account as a deduction under section 805(a)(2).

Thus, subsections (a) and (b) of § 807 treat decreases in a life insurance company's reserves as gross income and increases in reserves as deductions from income. By including any "excess" from § 809(a)(2) in those calculations, § 809 becomes much more than a device for merely "reducing" policyholder dividend deductions, although it can have that effect along the way. It is more properly characterized as a provision that simply imputes income to mutual companies. That imputed income adds the same amount to the mutual company's income tax regardless of the reason for any differences between stock and mutual earnings rates, regardless of the magnitude of the company's policyholder dividends, and even regardless of whether the company pays any dividends at all. See Department of the Treasury, *Final Report to the Congress on Life Insurance Company Taxation* at 25 n. 8 (Aug. 1989) (copy filed with court on Mar. 19, 1996) ("The imputation of equity income [in § 809] was described as a limitation on policyholder dividend deductions, but in fact it is an income imputation.").[4] As a result, the reliance on the "plain" language to construe § 809 as merely a means for reducing a particular deduction is not a sound basis for construing the statute.

(4) The government and the Eighth Circuit also rely on the interplay of § 809(f)(2) with § 808(c)(2) as a basis for prohibiting recognition of negative differential earnings rates. Indianapolis Life responds that the § 809(f)(2) deduction should not be limited by reference to § 808(c). The argument turns

on a statutory definition. Section 809(f)(2) provides that if the recomputed differential earnings amount for a taxable year exceeds the differential earnings amount as originally determined, any "excess" shall be allowed "as a life insurance deduction for the succeeding taxable year." Section 804 of the Code defines the term "life insurance deductions" to mean the "general deductions" provided in § 805 and the "small life insurance company deduction" (which is not relevant here). Section 805 provides for several deductions. The specific provisions relevant here are those allowing deductions for:

(3) Policyholder dividends. The deduction for policyholder dividends (determined under section 808(c)).

\* \* \* \* \* \*

(8) Other deductions. Subject to the modifications provided by subsection (b), all other deductions allowed under this subtitle for purposes of computing taxable income.

Except as provided in paragraph (3), no amount shall be allowed as a deduction under this part in respect of policyholder dividends.

26 U.S.C. § 805(a).

The district court in *American Mutual* held that the "life insurance deduction" allowed by § 809(f)(2) fell under the "catch-all" category of deductions under § 805(a)(8), and therefore should not be limited by the "reduction" language in § 808(c) for policyholder dividend deductions. *American Mutual Life Ins. Co. v. United States*, No. Civ. 4–92–70347, 1993 WL 556786 at \*3 (S.D.Iowa Nov. 2, 1993), *rev'd*, 43 F.3d 1172 (8th Cir.1994). The Eighth Circuit disagreed, stating there is "no material distinction between 'life insurance deduction' and 'policyholder dividend deduction' under the facts of this case." *American Mutual*, 43 F.3d at 1175. The Eighth Circuit relied on the language in § 805(a)(8) stating: "Except as provided in paragraph (3), no amount shall be allowed as

---

**4.** The 1989 Treasury report provides a detailed and highly critical analysis of § 809, both as it was conceived and as it has actually applied since enactment.

a deduction under this part in respect of policyholder dividends." Concluding that the "life insurance deduction" authorized under § 809(f)(2) was a deduction "in respect of policyholder dividends," the Eighth Circuit held that the limitations of § 808(c) applied to prohibit recognition of negative differential earnings rates such that a mutual company could deduct as a policyholder dividend deduction more than it paid or accrued in policyholder dividends that year. *American Mutual,* 43 F.3d at 1175.

On this question, the view of the district court in *American Mutual* is more persuasive than that of the Eighth Circuit. Section 809(f)(2) uses the broad term "life insurance deduction." It does not use the term "policyholder dividend deduction," nor does it refer to § 808(c). In addition, as discussed above, the ultimate tax effects of § 809 do not depend at all on the amount of the taxpayer's actual payments of policyholder dividends. Therefore, it is not obvious that the deduction allowed under § 809(f)(2) must be a deduction "in respect of policyholder dividends" as that phrase is used in § 805(a). Accordingly, it is not sufficiently plain that the language of § 808(c) applies here so as to prohibit recognition of negative differential earnings rates.

For all these reasons, then, this court concludes that, although the government's position is consistent with the language, that language can also reasonably support the plaintiff's view. The language is not so plain as to control the outcome of this case and require that plaintiff's claim for refund be rejected.

## II. Treasury Regulation § 1.809–9

After the district court issued its decision in favor of the taxpayer in *American Mutual,* the Treasury Department issued a new regulation stating that neither the differential earnings rate nor the recomputed differential earnings rate may be less than zero. See Treas.Reg. § 1.809–9. In *American Mutual,* the Eighth Circuit declined to decide the case on the basis of the regulation. 43 F.3d at 1176. While not the basis of its

decision in *American Mutual,* the Eighth Circuit did note that the treasury regulation provided a reasonable interpretation of 26 U.S.C. § 809, and that treasury regulations are entitled to great deference and must be sustained unless unreasonable and plainly inconsistent with revenue statutes. *American Mutual,* 43 F.3d at 1176.

This court believes that Treasury Regulation § 1.809–9 controls the result of this case. The regulation provides:

(a) *In general.* Neither the differential earnings rate under section 809(c) nor the recomputed differential earnings rate that is used in computing the recomputed differential earnings amount under section 809(f)(3) may be less than zero.

Treas.Reg. § 1.809–9(a). The regulation was adopted on December 10, 1993, and is effective for all taxable years beginning after December 31, 1986. The Treasury Department has statutory authorization to issue revenue regulations under 26 U.S.C. § 7805(a). Revenue regulations are presumptively applied retroactively, although the "Secretary [of the Treasury] may prescribe the extent, if any, to which any ruling or regulation, relating to the internal revenue laws, shall be applied without retroactive effect." 26 U.S.C. § 7805(b). The parties here apparently agree that if the regulation is valid, it controls the outcome of Indianapolis Life's claim for refund.

 Courts must respect treasury regulations when interpreting the Internal Revenue Code. "Treasury regulations are entitled to great deference, and must be sustained unless unreasonable and plainly inconsistent with the revenue statutes." *American Mutual,* 43 F.3d at 1176 (citing *Commissioner v. Portland Cement Co. of Utah,* 450 U.S. 156, 169, 101 S.Ct. 1037, 1045, 67 L.Ed.2d 140 (1981)). Congress has not expressly delegated authority to interpret the term "excess" in § 809(c)(1) to the Treasury Department. However, by

statute, Congress has delegated authority to interpret the Internal Revenue Code. Therefore, Congress has implicitly delegated authority to the Treasury Department to interpret § 809 of the Internal Revenue Code. Where Congress implicitly delegates regulation-making authority, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984).

So long as Treasury Regulation § 1.809–9 is valid, its plain language clearly resolves the issue in this case in favor of the government. Indianapolis Life raises two principal arguments against the validity of Treasury Regulation § 1.809–9. First, it argues that the regulation is contrary to the legislative purpose of § 809. Second, it argues that the regulation is a "fighting" regulation enacted with little genuine deliberation in order merely to aid the government's litigating position, so that it deserves little or no deference from the courts. For the reasons explained below, the court disagrees.

### A. The Legislative Purpose for § 809

■ The parties describe the purpose of § 809 very differently, and these differences are the principal reasons their expert witnesses have reached contrary conclusions. The government asserts that the purpose of § 809 was to reduce policyholder dividend deductions for mutual life insurance companies. Indianapolis Life asserts that the purpose of § 809 was to tax stock insurance companies and mutual life insurance companies in an equal and neutral way. Although there is some validity to each view, the court believes that the government's view of the purpose is too narrow and plaintiff's view is too broad. As explained above, § 809 by its terms does more than merely reduce deductions for policyholder dividends. It imputes income to mutual companies regardless of the amounts of such dividends they pay, if any. At the same time, § 809 cannot be expected, at least by itself, to assure equal and neutral taxation of stock and mutual companies. Section 809 aimed to eliminate what Congress perceived to be an unfair competitive advantage for mutual life insurance companies created by the incentives the tax code would otherwise give mutual companies to pay greater policyholder dividends. Both sides agree that Congress generally tries to tax similarly situated taxpayers in similar ways and generally tries to treat the stock and mutual segments of the life insurance industry in a neutral way without giving either segment a competitive advantage. That broad goal, however, is much easier to state than to achieve.

The government has tried to simplify this case greatly by pointing out that if Indianapolis Life's position is upheld, Indianapolis Life will be permitted to deduct a total of $22.6 million for policyholder dividends in 1986 when it actually paid or accrued only $20,940,502 during that year. The government suggests that this result runs counter to the language and purpose of § 809. The Eighth Circuit appears to have agreed, for it framed the issue in *American Mutual* as "whether Congress intended to give mutual life insurance companies so-called dividend deductions greater than their dividends in any given year." 43 F.3d at 1173.

This reasoning has some appeal, for it offers a simple solution to an otherwise complex problem. However, the following discussion, including the views expressed by the government's expert witness, should dispose of this rationale. Section 809 is designed to operate over a period of years. That much is evident from the use of the three year average for the "current" stock earnings rate and its ultimate comparison to the average mutual earnings rate for a different year not included at all in the relevant three year stock average. It is also evident in the need for the recomputation on the taxpayer's return for the year following the relevant taxable year. While annual accounting generally dominates federal taxation, see *Healy v.*

*Commissioner,* 345 U.S. 278, 281, 73 S.Ct. 671, 673–74, 97 L.Ed.2d 1007 (1953), § 809 must operate over a period of years.

The fact that Indianapolis Life seeks to deduct more than it paid in policyholder dividends in 1986 does not mean, without more, that its position is wrong. Even under Indianapolis Life's position, fluctuating earnings rates in both sectors of the life insurance industry over time will balance out the effects of one unusual year. In some years, the combination of fluctuating rates of return and § 809 will prohibit Indianapolis Life from deducting large proportions of the policyholder dividends it actually paid. What might appear to be a "windfall" for a taxpayer in one year will be balanced by taxes that could appear "punitive" for other years. In fact, if the differential earnings amount calculated under § 809 is greater than the policyholder dividends actually paid or accrued by the mutual company in a taxable year, the excess is effectively treated as extra taxable income for the company. See 26 U.S.C. § 809(a)(2), referencing taxation of changes in reserves under 26 U.S.C. § 807(a) & (b). Thus, the § 809 imputation of income is not limited by the taxpayer's actual payment of policyholder dividends.

■ Indianapolis Life argues that the regulation's prohibition on recognizing negative recomputed differential earnings rates undermines the purpose of § 809 by producing a significant distortion in the taxation of mutual life insurance companies *over time.* Indianapolis Life contends this effect is contrary to the purpose of § 809. A Treasury Regulation must be a "reasonable interpretation" of a statute, one that "harmonizes with the statute's 'origin and purpose,'" and may not be "fundamentally at odds with the manifest congressional design." *United States v. Vogel Fertilizer Co.,* 455 U.S. 16, 26, 102 S.Ct. 821, 828, 70 L.Ed.2d 792 (1982).

We now turn to the distorting effect identified by plaintiff and its experts. The distorting effect arises from the undisputed fact that the final tax effect of § 809 is based on a comparison of stock companies' earnings against mutual insurance companies' earnings *for two different time periods.* Because returns on operations (and especially on investment portfolios) will vary from year to year in an unpredictable way,[5] the comparison of earnings rates from different periods will impose a tax in some years that is in excess of that needed to compensate for the mutual companies' tax advantage. This will occur, for example, if rates of return are falling. Over time, these excessive taxes could be compensated for by recognizing negative recomputed differential earnings rates in the calculations used to apply § 809(f)(2). That is, where rates of return are rising, recognizing a negative recomputed differential earnings rate would permit a mutual company to deduct more than it actually paid in policyholder dividends for that specific year, but this effect should compensate over time for the years when the mutual company can deduct much less than it paid in policyholder dividends.

Plaintiff's expert witness, Dr. Boskin, illustrated this effect with two tables. The first assumes that the earnings rates of the stock and mutual segments of the industry are identical. In that case, under the theory supporting § 809, there would be no reason to impute any additional income to mutual companies. In this illustration, the effect of using mutual and stock earnings rates from two different time periods, combined with a refusal to recognize negative differential earnings rates, would produce a significant additional tax on the mutual companies, even though they were earning at exactly the same rate as stock companies:

---

**5.** Anyone who could predict in a reliable way these variations in earnings rates from year to year should be able to make a fortune by trading

**BOSKIN TABLE 4**
**OPERATION OF SECTION 809 ASSUMING NO CURRENT YEAR DIFFERENCE IN STOCK AND MUTUAL RATES**

| Year | Mutual Rate | Stock Rate [6] | Annual Diff. | Imputed Rate | RDER | Gov't Position |
|------|------|------|------|------|------|------|
| | 15 | 15 | 0 | | | |
| | 21 | 21 | 0 | | | |
| | 9 | 9 | 0 | | | |
| 1 | 15 | 15 | 0 | 15 | 0 | 0 |
| 2 | 21 | 21 | 0 | 15 | −6 | 0 |
| 3 | 9 | 9 | 0 | 15 | 6 | 6 |
| Average | 15 | 15 | 0 | 15 | 0 | 2 |

(In case the difference between zero and two percent looks small, one must recall that the percentages used in this table would apply to many billions of dollars in earnings, both real and imputed.) Table 4 assumed identical earnings rates for both segments of the industry. The same reasoning also holds, however, if a difference in earnings rates is assumed, as Congress expected would occur. Dr. Boskin's Table 5 assumes that the stock segment of the industry always earns 3 percent more per year than the mutual segment, but that the rates for both vary over time:

**BOSKIN TABLE 5**
**EFFECT OF CHANGING CONDITIONS ON RDERs**

| Year | Mutual Rate | Stock Rate [7] | Annual Diff. | Imputed Rate | RDER | Gov't Position |
|------|------|------|------|------|------|------|
| | 12 | 15 | 3 | | | |
| | 18 | 21 | 3 | | | |
| | 6 | 9 | 3 | | | |
| 1 | 12 | 15 | 3 | 15 | 3 | 3 |
| 2 | 18 | 21 | 3 | 15 | −3 | 0 |
| 3 | 6 | 9 | 3 | 15 | 9 | 9 |
| Average | 12 | 15 | 3 | 15 | 3 | 4 |

Again, the effect of varying earnings rates over time, combined with the refusal to recognize negative differential earnings rates, is a significant increase in the tax burden for mutual companies—one that is greater than would be justified by the assumed difference in earnings rates. Also, note that under Table 5, the mutual company would pay less tax in year 2, in which the negative differential earnings rate would apply, but a much larger tax for year 3, when the much lower mutual earnings rate would be measured against the average of the much higher stock earnings rates of the prior three years. Allowance of a larger deduction for year 2 would therefore be balanced by a much smaller (or zero) deduction for year 3.

After considerable skirmishing by counsel on this issue, the government has eventually agreed with the basic premise of plaintiff's argument. The government's expert witness, Dr. Doherty, substantially conceded the strength of Indianapolis Life's argument on this point. Dr. Doherty's affidavit states:

in stock options and other investment futures. See Doherty Dep. at 11.

6. Table 4 disregarded the 90.55 percent index feature of § 809.

7. Table 5 also disregarded the 90.55 percent index feature.

"the suppression of negative [recomputed differential earnings rates] does introduce a source of non-neutrality in to Section 809 as demonstrated by [plaintiff's experts] Vogel and Boskin." Doherty Aff. at 14. Later, Dr. Doherty states that "disallowance of negative RDER's does penalize mutuals." Doherty Aff. at 33. Viewed in isolation, then, nonrecognition of negative recomputed differential earnings rates distorts mutual company tax burdens, significantly reducing the deductions allowed and thereby increasing the tax burden.

The government further argues, however, that § 809 simply does not provide a pure method for "neutralizing" the taxation of stock and mutual companies, even with respect to the narrow issue of policyholder dividends. The statute reflects instead, according to the government, a complex but only rough compromise struck by Congress. The government, supported by the *amicus* stock company group, argues that other features of § 809 also depart from a theoretically pure method, and that some of these other features work to the benefit of mutual companies. The government argues that mutual companies should not be allowed to "cherry-pick" a single feature that they do not like.

The statute includes other distortions from the theoretically neutral model that is the basis for plaintiff's arguments. For example, the statute provides for the use of accounting values rather than economic market values when estimating mutual company equity returns. Doherty Aff. at 14. Also, the statute provides for calculation of stock earnings rates based on a numerical average of the earnings rates of the fifty largest stock companies, while providing for calculation of mutual earnings rates by reference to the weighted average of earnings of all (now approximately 110) mutual companies. There is no reason to expect these features, however, to favor either the mutual or the stock segments of the life insurance industry, so as to offset any distorting effect of the refusal to recognize negative differential earnings rates.

Most important for the government's argument is the index value of 90.55 percent, which is used to calculate the imputed stock earnings rate. The 90.55 percent rate was derived pursuant to § 809(d), which provides that the all-important "imputed earnings rate" for tax years beginning after 1984 would be "an amount which bears the same ratio to 16.5 percent as the current stock earnings rate for the taxable year bears to the base period stock earnings rate." 26 U.S.C. § 809(d)(1)(B). The base period stock earnings rate, defined in subsection (d)(3), was calculated to be 18.221 percent, producing the factor of 90.55 percent. That factor, based on industry experience in 1981–83, will remain in place until Congress amends § 809. Congress explained this unusual feature in the committee report:

> The committee anticipates that this 16.5–percent rate will result for 1984 in the mutual segment of the industry bearing 55 percent of the aggregate industry tax burden. The committee believes that this is appropriate in the light of a number of factors including the historic allocation of the industry's tax burden, the relative percentages of assets held by the stock and mutual segments of the industry and the difference in treatment of mutual company policyholders and stock company shareholders. Since the committee believes that the 16.5–percent rate results in an appropriate allocation of the industry's tax burden for 1984, it has decided to adjust this rate in proportion to changes in the rate of return for large stock companies and not simply to replace the imputed rate with one equal to the actual rate of return of a group of stock companies in subsequent years.

House Report at 1423; 1984 U.S.C.C.A.N. at 1068 (footnote omitted).

The 90.55 percent index feature is a substantial buffer for mutual companies against the effects of § 809. In effect, the index feature means that if the "average mutual earnings rate" for a given tax year is only 90.55 percent of the applicable current stock earnings rate, the differential earnings rate will be zero, and § 809 will have no effect on the taxes of mutual companies even though

their reported earnings are significantly below the current stock earnings rate.[8]

The extent of this buffer effect is shown in the affidavit of Mr. DesRochers, one of the government's experts. Mr. DesRochers calculated what he called "theoretical" differential earnings rates by "correcting" four features of § 809 that depart from a theoretically neutral comparison of stock and mutual earnings rates. First, he used a weighted average for the 50 largest stock companies (rather than a simple arithmetical average, as required by § 809). Second, he compared the stock and mutual rates for the same year (rather than comparing the current mutual rate to the trailing three year average of stock rates). Third, he disregarded the 90.55 percent index effect created by § 809, so that he compared the actual stock earnings average to the actual mutual earnings average. Finally, he recognized negative differential earnings rates, as plaintiff suggests is necessary for neutral tax treatment of stock and mutual companies. The results are shown in DesRochers' Table 1:

**DESROCHERS TABLE 1**
**THEORETICAL DIFFERENTIAL EARNINGS RATE UNDER § 809**

| YEAR | STOCK WEIGHTED AVG. EARNINGS RATE | MUTUAL AVERAGE EARNINGS RATE | DIFFERENCE THEORETICAL DIFFERENTIAL RATE | RDER GOVERNMENT POSITION | RDER PLAINTIFF POSITION |
|---|---|---|---|---|---|
| 1984 | 19.572% | 5.746% | 13.826% | 10.754% | 10.754% |
| 1985 | 20.826% | 13.135% | 7.691% | 3.188% | 3.188% |
| 1986 | 21.195% | 17.980% | 3.215% | 0.000% | −1.695% |
| 1987 | 8.670% | 8.735% | −0.065% | 8.076% | 8.076% |
| 1988 | 13.013% | 13.604% | −0.591% | 0.945% | 0.945% |
| 1989 | 16.393% | 16.507% | −0.114% | 0.000% | −3.566% |
| 1990 | 13.193% | 11.401% | 1.792% | 0.885% | 0.885% |
| 1991 | 20.026% | 16.483% | 3.543% | 0.000% | −2.426% |
| 1992 | 14.295% | 18.577% | −4.282% | 0.000% | −2.615% |
| 1993 | 18.559% | 18.406% | 0.152% | 0.000% | −5.795% |
| SUM | 165.742% | 140.574% | 25.168% | 23.849% | 7.751% |
| AVERAGE | 16.574% | 14.057% | 2.517% | 2.385% | 0.775% |

The table shows, over the ten year period, an average "theoretical" differential earnings rate of 2.517 percent. By contrast, applying § 809 according to the Treasury Regulation § 1.809-9, with all its "imperfections" from the theoretical comparison, produces an average differential earnings rate of 2.385 percent. Applying § 809 according to plaintiff's position, where the only "correction" is permitting negative differential earnings rates, produces an average differential earnings rate of only 0.775 percent. Table 1 tends to

8. Plaintiffs argue that at the time § 809 was enacted, it was not known whether the index would be above or below 100 percent. An index above 100 percent would increase the tax burden imposed by § 809 on mutual companies; the actual index below 100 percent acts as a buffer to reduce that burden. The government's expert, Dr. Doherty, acknowledged in his deposition that if the index had turned out to be greater than 100 percent, that would have created a distortion against the mutual segment of the industry and would have tipped the balance of § 809. Doherty Dep. at 53–56.

show that, for this ten year period, the government's approach produces a rough compromise that is much closer to the theoretical ideal embraced by both sides' experts than plaintiff's approach.

Plaintiff argues that the 90.55 percent index feature should not undermine its position. Plaintiff points out that Congress deliberately chose the index feature of § 809, so that it cannot be treated as an "error" or "imperfection," and argues that the use of a 90 percent index figure could be justified on a number of grounds, including the use of only large stock companies in the average or other tax advantages available to stock companies but not mutual companies. The point, here, however, is not that the index feature is a defect in the statute. Rather, the point is that if one accepts plaintiff's view of the neutrality purpose of § 809—which is plaintiff's premise for insisting on recognition of negative differential earnings rates—then the index feature is also a significant departure from the hypothetical neutral ideal. The court need not accept the idea that the index feature is in some sense "wrong" to conclude that the index feature and the refusal to recognize negative differential earnings rates tip an otherwise roughly neutral balance in opposite directions. Section 809 strikes a rough balance between the interests of stock and mutual companies. The approach adopted in Treasury Regulation § 1.809–9, refusing to recognize negative recomputed differential earnings rates, increases the tax burdens on mutual companies. However, other features, including the 90.55 percent index, improve the situation by favorably affecting mutual company tax burdens. "Fixing" one feature in isolation would upset the rough balance struck by Congress. Looking at the overall effect of § 809, Treasury Regulation § 1.809–9 does not conflict with the language of the statute, and it is not inconsistent with—it may even promote—the rough compromise produced in Congress.

### B. "Fighting" Regulation

Indianapolis Life argues that Treasury Regulation § 1.809–9 should not be afforded any deference by this court. Indianapolis Life characterizes it as a "fighting regulation" issued for the purpose of bolstering the government's litigation position in the *American Mutual* case. Indianapolis Life points to the timing of the regulation's adoption, the initial announcement of a negative recomputed differential earnings rate for 1986, and the assertedly "non-deliberative" process leading up to adoption of the final regulation. These arguments will be addressed in turn.

■ First, the timing of the final adoption of Treasury Regulation § 1.809–9 lends some support to Indianapolis Life's characterization that it is a "fighting regulation." On June 2, 1992, the plaintiff filed its complaint in the *American Mutual* case. On August 19, 1992, the government promulgated the proposed regulation. Then, on November 2, 1993, the district court in *American Mutual* issued its decision contrary to the government's position. Just five weeks later, the Treasury Department adopted Regulation § 1.809–9 on December 10, 1993. However, plaintiff's argument based on timing is undermined by the fact that the Treasury Department had announced its intention to issue such a regulation several years earlier when it issued I.R.S. Notice 88–106, 1988–40 I.R.B. 7 (later reprinted in 1988–2 C.B. 444).

Indianapolis Life has not cited any case where a court has struck down an interpretive regulation on the basis that it was a "fighting" regulation intended to bolster a litigating position, but it relies on two cases where courts at least acknowledged the possibility that a regulation adopted to assist the government in litigation might be held invalid. In *Chock Full O' Nuts Corp. v. United States*, 453 F.2d 300 (2d Cir.1971), the Second Circuit considered a taxpayer's argument that the court should not apply a Treasury Regulation retroactively because the regulation was allegedly adopted to bolster the Internal Revenue Service's litigation position in that case. In *Chock Full O' Nuts* the government had changed its position on the disputed statutory provision. *Id.* at 303 n. 9. The court commented that it was "questionable whether [the challenged regulation] represents a valid exercise of the Commissioner's power to promulgate retroactive regulations." *Id.* at 303. However, the court also noted that it was unnecessary

to reach that issue and decided the case on other grounds. *Id.* Similarly, in *Caterpillar Tractor Co. v. United States,* the Court of Claims noted: "It may be an abuse of discretion to adopt a regulation with the purpose of aiding pending litigation." 218 Ct.Cl. 517, 589 F.2d 1040, 1043 (1978) (citing *Chock Full O' Nuts*). However, the court went on to determine that the adoption of the regulation in that case was not an abuse of discretion. *Id.* at 1044.

■ The fact that a treasury regulation may affect pending litigation does not undermine its validity. *Anderson, Clayton & Co. v. United States,* 562 F.2d 972, 980 (5th Cir.1977). The Fifth Circuit noted in that case that a more serious question could arise if the government's new regulation were an attempt to change settled law upon which taxpayers had relied. *Id.* at 981. As the government points out in its opening brief, the Secretary of the Treasury may promulgate retroactive regulations at any time. In fact, the statutory grant of authority presupposes that regulations will be applied retroactively. See 26 U.S.C. § 7805(b). The Treasury Department's regulatory authority cannot be suspended whenever statutory provisions are challenged in the courts. By filing a lawsuit, the American Mutual Life Insurance Company did not prevent the Treasury Department from issuing otherwise valid regulations interpreting the statute at issue in the lawsuit. Even if the Treasury Department drafted Regulation § 1.809–9 with the litigation in mind, it had the authority to do so as long as it used proper procedures and the end result was consistent with the statute's language and purpose.

■ Indianapolis Life also argues that Treasury Regulation § 1.809–9 deserves no deference because the government had made up its mind on the issue long before it actually promulgated the regulation. Indianapolis Life does not contend that the government failed to comply with any procedural requirements in issuing the regulation. The government gave notice of the proposed rulemaking, invited comments, held a public hearing, and at least addressed the supportive comments from the stock life insurance companies and the critical comments from the mu-

tual life insurance companies. See 58 Fed. Reg. 64897, 64898 (1993) (final rule). However, the government issued the proposed rule in August 1992, nearly four years after announcing that it intended to issue regulations that would provide that negative differential earnings rates would not be recognized. Compare 57 Fed.Reg. 37495 (1992) (notice of proposed rulemaking) with I.R.S. Notice 88–106, 1988–40 I.R.B. 7 (announcing what future regulations "will provide").

Plaintiff's argument is that because the government made up its mind long before the regulation was even proposed, there was no genuine deliberative process warranting any deference from the courts. See *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944) (persuasive force of agency's interpretation of statute it administers depends on thoroughness of consideration, validity of reasoning, consistency with other pronouncements, and other factors). More recently, however, the Supreme Court has made it clear that the deference courts must give an executive agency's interpretation of an ambiguous statute does not depend on a close judicial review of the agency's internal decision-making processes or the extent of public participation in that process. In *Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. at 843, 104 S.Ct. at 2781–82, the Court explained that if a statute is silent or ambiguous on a question, which is the case here, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." Language in the accompanying footnote is directly applicable here: "The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." 467 U.S. at 843 n. 11, 104 S.Ct. at 2782 n. 11. Under *Chevron,* an executive agency is entitled to choose between reasonable interpretations of an ambiguous statute, and that is what the government has done in issuing § 1.809–9. The explanations provided with the proposed and final rule may not be persuasive in showing that the rule provides the *only* reason-

able interpretation of § 809, but for the reasons discussed in detail above, the rule does provide *one* reasonable interpretation of the statute. Under the circumstances, that is sufficient, and the courts cannot substitute their own policy choices for those made by the executive agency so long as they are not inconsistent with the statute.

Finally, the court must also note that it is apparent from the actions of the IRS and the Department of the Treasury that the negative differential earnings rate issue had been debated extensively, with plenty of input from the affected sectors of the life insurance industry, long before the rule was proposed in 1992. It is highly improbable that the IRS's public reversal of its position in 1988 was a hasty or spur-of-the-moment action. The IRS's initial announcement of a negative differential earnings rate for 1986, its later reversal of position, and the timing of the issuance of the final regulation have provided plaintiff with fertile ground for argument. Ultimately, however, Treasury Regulation § 1.809-9 is based on a reasonable and permissible construction of an ambiguous statute. By its terms, the regulation conclusively resolves the issue before the court, and the government is entitled to judgment as a matter of law.

### Conclusion

The briefs of the plaintiff mutual company, the government, and the *amicus* stock company group show that everyone is unhappy with § 809 as it now functions, under either approach to the negative recomputed differential earnings rate question. They are unhappy for different and contradictory reasons. Perhaps that general unhappiness, at least as expressed in this court, is evidence of an inelegant but reasonable legislative compromise of a complex issue between competitors. Perhaps it is a symptom of an ill-conceived compromise reached without sufficient foresight. Those questions, however, are for Congress to decide. With respect to the narrow issue before this court, Regulation § 1.809-9 constitutes a valid interpretative regulation entitled to deference. Regulation § 1.809-9 indicates that the negative recomputed differential earnings amount in § 809(f) of the Internal Revenue Code cannot be less than zero. Therefore, the government correctly denied plaintiff's request for tax refunds based on a negative recomputed differential earnings amount. The government's motion for summary judgment is GRANTED and the plaintiff's motion for summary judgment is DENIED. Judgment will be entered.

So ordered.